### SKUY v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. October 27, 1919.)

#### No. 5182.

1. CRIMINAL LAW ⊜⇒730(3)—CROSS-EXAMINATION CONTRARY TO RULING NOT CURED BY JUDGE'S STATEMENT.

Repeated suggestions by the government's attorney, in the cross-examination of defendant's character witness, of his failure and bankruptcy after the court's ruling against this, will be regarded as having fastened them in the minds of the jury too securely to permit of their re-

moval by a few oral statements by the judge in the midst of the trial, and as an invitation to the jury to disregard the court's ruling.

2. CRIMINAL LAW ⊙1169(1)—EVIDENCE IN DISREGARD OF RULINGS PREJUDICIAL.

Irrelevant and immaterial evidence, injected into the minds of the jury in disregard of the rulings and directions of the court, is not less prejudicial than such evidence admitted over objection under an erroneous ruling.

3. CRIMINAL LAW ⊙723(5)—ARGUMENT APPEALING TO RACE PREJUDICE NOT HARMLESS ERROR.

Argument of government's attorney, in effect a statement that in his estimation the testimony of one soldier boy, perhaps of one person not a Jew, was of greater weight than that of all Jews, made with reference to the testimony of a soldier for the prosecution, contrary to that of four Jews, is prejudicial error.

4. CRIMINAL LAW ⊙1035(1), 1053, 1129(1)—REVIEWING ERROR WITHOUT OBJECTION, EXCEPTION, OR ASSIGNMENT.

Radical fault in the trial for a crime involving the liberty of defendant will be noticed and corrected by the reviewing court, though there be no proper objection, exception, or assignment.

In Error to the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Abraham Skuy was convicted of perjury, and brings error. Reversed, and remanded for new trial.

H. B. Martin, of Tulsa, Okl. (Crossland & Crossland, of Paducah, Ky., on the brief), for plaintiff in error.

C. W. Miller, Sp. Asst. U. S. Atty., of Muskogee, Okl. (W. P. McGinnis, U. S. Atty., of Muskogee, Okl., on the brief), for the United States.

Before SANBORN and STONE, Circuit Judges, and TRIEBER, District Judge.

SANBORN, Circuit Judge. Abraham Skuy, the defendant below, was indicted for perjury in three counts, in that, in his examination as a bankrupt before the referee in bankruptcy: (1) He falsely testified that he never sold any of his goods below cost; (2) he falsely testified that he never sold any of his goods to Jacob Fell; and (3) he falsely testified that he never removed any goods from his store in an automobile. After the assistant United States attorney had introduced testimony tending to sustain each of these charges, and the defendant had introduced the testimony of six witnesses which tended to contradict the testimony on behalf of the United States, the assistant attorney announced that he had reached the conclusion that the evidence relative to the charges in the first and second counts did not warrant the court in submitting that evidence to the jury, there was no further controversy regarding these counts, and at the close of the trial the court instructed the jury to return a verdict for the defendant thereon.

The evidence on the third count presented two issues of fact: First, whether or not the defendant ever testified that he never took any goods out of his store in an automobile; and, second, whether or not he did take any goods out of his store in an automobile. On each of these

counts the evidence was conflicting, but the real issue tried was whether or not the defendant, about April 15, 1916, removed a large quantity of goods from his store in the nighttime. Upon this issue two witnesses, Evans and Lee, testified that he did, and four witnesses, the defendant and Oscar Stekoll, Abraham Stekoll, and Lewis Stekoll, testified that he did not. All these witnesses, except Lee, were members of the Jewish race. In April, 1916, Evans was engaged in the same kind of business as that which Skuy conducted, gents' furnishings and loans, and he occupied the store by the side of Skuy's store. Lee at that time was an employé of Evans, with whom he roomed and slept. At the time of the trial, however, he was a private in the Marine Corps. In April, 1916, Evans was unfriendly to Skuy, and Lee became so before he testified. After Evans and Lee had testified for the government, and Skuy and three other witnesses had testified for the defendant as to the removal of the goods, M. Himelstein, the Jewish rabbi in charge of the Jewish Congregation at Tulsa, and five other Jews, testified that they knew the reputation of Skuy and Evans for truth and veracity in the community in which they lived, and that Skuy's was good and Evans' was bad. There was no contradictory testimony on this question.

[1, 2] In the course of the trial Mr. William Reedman was called on behalf of the defendant, and testified that he lived in Tulsa; that he had lived there for 10 years; that he was then and had been during these 10 years engaged in the mercantile business; that he was a "member of the Jewish race and persuasion"; that he knew the reputation of Skuy and Evans for truth and veracity; that Evans' reputation was not very good, but that Skuy "is a good boy." On the cross-examination of this witness, the first question asked by the assistant United States attorney was, "What was the date of your failure, Mr. Reedman?" Defendant's attorney objected and said:

"Nothing in the evidence here that I have observed that this man has ever failed."

Then the examination proceeded in this way:

"Q. You are a special friend of Mr. Skuy's, are you not? A. Not a special friend: same as everybody is.

"Q. I will ask you this question: If at the time you failed, if you did fail, you didn't store your goods in Mr. Skuy's store until a financial settlement was made with your creditors? A. There was no such things like that.

"Q. You know Mr. Stekoll, do you not? A. Yes, sir.

"Q. What connection did he have with the matter I have just referred to? "Mr. Martin: If the court please, I object to that as irrelevant and immaterial.

"The Court: Objection sustained."

Later, in the cross-examination, after inquiring concerning Mr. Reedman's business relations with Mr. Robert A. Stekoll, the assistant attorney again returned to Mr. Reedman's suggested failure in this way:

"Q. Was he [Stekoll] one of your creditors in your bankruptcy matter? A. No, sir.

"Q. Did he act as trustee? A. No, sir.

"Q. Did he have any connection whatever with your bankruptcy matter? A. None at all, sir.

"Q. Do you state that no part of your goods were stored in Skuy's store pending a settlement with your creditors in your bankruptcy matter?    A. Positively not.

"Mr. Crossland: I move to exclude that about the bankruptcy, or anything else.

"The Court: Overruled.

"Mr. Crossland: Exception."

The witness was then dismissed, and the court then and there instructed the jury that the answers of this witness were testimony for their consideration, but that counsel's questions were not, and that, even though it might appear from the testimony of the witness that he had been a bankrupt, he was presumed, until the contrary was shown, to have properly availed himself of the bankruptcy law, and it was not a matter which should be permitted in any way to affect his testimony in the case.

No one will deny that the failure of Mr. Reedman in his mercantile business and his bankruptcy were irrelevant to any issue in this case, and that it was the duty of the court and counsel alike to keep these matters, not only from the consideration, but from the hearing of and the suggestion of them to the jury. The testimony of one who has failed in business or taken the benefit of the Bankruptcy Act is not rendered unworthy of belief, nor is it rendered less credible, by that fact. If the assistant attorney was ignorant of the plain rule of law which rendered the failure and bankruptcy of Reedman irrelevant evidence, which we do not intimate, he was informed of it by the ruling of the court upon the first question he asked on the cross-examination of Reedman. Nevertheless he returned to the suggestion of the failure and bankruptcy twice in his cross-examination, which occupies only two printed pages. After that first ruling was made, the duty rested upon him, as well as upon the court, to prevent further attempts to prejudice the jury against the testimony of Mr. Reedman and the defense of the defendant by endeavoring by questions to fasten in the minds of the jury the failure and bankruptcy of Reedman. The court, when the cross-examination was closed, clearly perceived the prejudicial nature of the questions of the assistant attorney, and immediately instructed the jury to disregard them; but the repeated suggestions of the failure and bankruptcy by the questions probably fastened them in the minds of the jury too securely to permit of their removal by a few oral statements of the judge in the midst of the trial, and the disregard by the assistant attorney of the ruling of the court on these suggestions was a plain invitation to the jury to follow his example and likewise disregard it. Irrelevant and immaterial evidence, injected into the minds of the jury in disregard of the rulings and directions of the court, is not less prejudicial than such evidence admitted over objection under an erroneous ruling of the court.

[3] After the evidence was closed the assistant attorney in his argument to the jury in substance said:

"It is a well-known rule of law that hearsay evidence is not admissible in criminal cases; but there is one exception to this rule: In murder cases the

dying declaration of the injured man is admissible, because the law recognizes that a man about to face his God is more apt to tell the truth than otherwise. This man Lee was on the Atlantic Coast with·his company, ready to join the army in France, and was called to testify in this case by an order of the Secretary of War, that justice might be done."

At this point the trial court interrupted the speaker, instructed him that the argument he was making was improper, and admonished him to proceed no further on that line. Later in his argument the speaker again referred to the testimony of the witness Lee, and stated in substance that he did not care how many Jews the defendant brought there to testify, or what they swore to, that he believed that the soldier boy swore to the truth, that he had no interest in the case, and that every word that he testified to was the truth, and in delivering this statement he emphasized the word "soldier." An objection was made and exception taken to this latter part of the argument when it was made.

The argument challenged was in effect a statement that in the estimation of the assistant attorney the testimony of one soldier boy, perhaps of one person who was not a Jew, to a disputed fact, was in his estimation of greater weight than that of all Jews, however truthful, upright, intelligent, and numerous, who had knowledge of the fact, and this statement was made to induce the jury to adopt that view, and to find the defendant guilty on the testimony of Lee, notwithstanding the testimony of four Jewish witnesses to the contrary. The application of that rule in general practice would in effect disqualify members of the Jewish race from testifying against the testimony of members of another race, because it would render their testimony futile. Such a rule would fly in the teeth of the basic principle of our jurisprudence, that every citizen, regardless of position, property, race, or belief, is entitled to the same privileges before the law, and to the same impartial trial in court, as every other citizen who comes before it.

The testimony of the Jew, the Catholic, the Protestant, the member of each religious sect and of every political party, is entitled in the courts of this land to be weighed, considered, and given credibility and effect under the established rules of evidence according to the probability of its truth, and the character and reputation of him who gives it, free from any consideration of or prejudice against the sect or party to which he belongs or the religious belief he holds. The arguments of a lawyer representing this nation in the presentation of a case of the United States against the defendant are not without great weight and influence. Counsel for the United States permitted his zeal and anxiety for success to carry him so far in this case that the conviction cannot be escaped that there was prejudicial error in this trial which prevented it from being fair and impartial.

[4] The contention that proper objections were not made, and proper exceptions were not taken, to permit the consideration in this court of the issues which have been discussed, has not escaped attention, but it fails to convince. Hall v. United States, 150 U. S. 76, 80, 82, 14 Sup. Ct. 22, 37 L. Ed. 1003; Waldron v. Waldron, 156 U. S. 361, 380, 381, 382, 15 Sup. Ct. 383, 39 L. Ed. 453. And even if it were tenable, this is a trial for an alleged crime, it involves the liberty of the citizen,

and the fault in the trial is so radical that it may well be noticed and corrected by this court without objection, exception, or assignment. Wiborg v. United States, 163 U. S. 632, 659, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289; August v. United States, 257 Fed. 388, 391, 393, —— C. C. A. ——.

Let the judgment below be reversed, and let the case be remanded to the court below, with directions to grant a new trial.