15962

STATE v. HINTON *ET AL.*

(48 S. E. (2d) 360)

*Messrs. Gaston & Hamilton,* of Chester, for Appellants, cite :

*Mr. W. Gist Finley,* Solicitor Sixth Judicial Circuit, of York, and *Mr. Robert W. Hemphill,* of Chester, for Respondent, cite:

June 18, 1947.

FISHBURNE, Justice.

The appellants, Frank Hinton, a sixteen year old Negro boy, and his sister, Azalee Simpson, were tried for the killing of Barto Alley, a white man, on the afternoon of December 3, 1945, at a combination store and gasoline service station on the outskirts of the city of Chester. Hinton was convicted of murder and sentenced to death, and Azalee Simpson was convicted of murder, with recommendation to mercy, and sentenced to life imprisonment.

The record discloses that the deceased, Barto Alley, his father-in-law, Floyd Ramey, and his brother-in-law, H. O. Robbins, left their homes in Fairfield County on the morning of December 3rd, to spend the day in Chester. They left Chester in the afternoon, and on their return trip stopped at the service station operated by Woodrow Bagley. It is admitted that they drank a bottle of beer in the morning before leaving Chester, and that they were engaged in drinking beer at the service station shortly before Alley was killed. The accused, Hinton, was warming himself by the stove in the service station when Alley, Ramey and Robbins entered. He started to leave the store, and was passing by Alley, who stood near the front door, when the latter slapped him severely in the face, with the statement that he "did not know what negroes were coming to", and that they should have more respect; or words to that effect. Hinton did not return the blow and said nothing in reply, but it may be

inferred from the testimony that he became enraged. He and Alley were strangers to each other, having never met before. The great weight of the testimony is that the attack made by Alley on Hinton was entirely without legal provocation, although the inference may be drawn that Hinton cursed or said something to him as he passed.

Immediately after the blow was struck, Mrs. Bagley, who was in the store, directed Hinton to go home. He left, but before leaving remarked, "I will be back". He lived about 100 yards away. Mrs. Bagley told Alley that he should not have struck the colored boy, and suggested that he leave the store.

Within five minutes, Hinton returned with his shot gun, accompanied by his sister, the appellant, Azalee Simpson. As he got within 20 feet of the store, Alley, who had not left the doorway, went out to meet him, with the statement that he was not afraid of any "Shine". In the melee which followed, Alley first encountered Azalee Simpson and they exchanged blows with their hands. (It does not appear that either had a weapon.) Azalee was pushed aside or stepped aside; and the evidence tends to show that Alley then attempted to seize the gun from the hands of Hinton. It may be inferred that he had hold of the muzzle when he was shot, the load entering his stomach. There was testimony that Azalee struck him again as he was falling. As a result of the wound Alley died within a few hours at a hospital in Chester.

Several alleged errors are relied upon by counsel for appellants to reverse the judgment of conviction. We will consider only two of them, because the disposition of these in our opinion will be conclusive of the case.

It appears from the record that during a part of the arguments of the solicitor and the other attorneys the trial judge left his seat on the bench, having first requested and obtained the consent of counsel for the state and for the defense to do so. During the five lengthy arguments made in

the case the judge for a part of the time was on the bench; at other times he was in the court room and the corridor adjacent thereto, or in his chambers adjoining the court room with the door open where, presumably, he could see and hear what took place in the court room.

While the judge was in his room adjoining the court room, the solicitor in his argument to the jury said in substance: "I do not ask you to convict the defendants merely because a white man was killed by a Negro. At the last court held here this very month I asked a jury to convict a Negro man who murdered a Negro girl in cold blood, and the jury found him guilty and he was sentenced to the electric chair."

Immediately after the above statement was made Mr. Gaston, one of the attorneys for the defense, left the court room and informed the trial Judge that in his opinion the solicitor was making an improper argument. Thereupon the judge immediately returned to the bench. However, the solicitor, after making the remarks above quoted, had passed on to other matters and no objection or motion was made by defense counsel with reference to this alleged objectionable argument nor was the court stenographer asked to take down the argument for transcription. Objection to the quoted statement was not made specifically until a motion for a new trial was argued and overruled several weeks after the rendition of the verdict.

Later in his argument to the jury, and while the judge was on the bench, the solicitor said in effect: "If you recommend mercy the sentence would be life imprisonment, but even that does not necessarily mean that he will serve for life there, because  *  *  *."

At this point, counsel for appellants objected and the solicitor remarked to the court: "That is the law, as they are eligible for parole after five to ten years." Upon which the judge said: "Mr. Solicitor, I would not do that; I don't think that I would go into what might be done. I would not pursue that."

Appellants contend that they are entitled to a new trial on the ground that the remarks made by the solicitor in his argument to the jury were improper and prejudicial and inflamed the minds of the jurors against the appellants, who are Negroes, and deprived them of a fair and impartial trial.

With reference to the statement first above quoted, made by the solicitor in his argument during the absence of the trial Judge from the bench, no formal objection was interposed at the time to the argument nor was any ruling requested or made thereon. The proper procedure, where an issue of this kind arises in the trial of a case, is pointed out in *State v. Meehan,* 160 S. C. 111, 158 S. E. 151. However, in view of the fact that this is a capital case, we will undertake to pass upon the question presented just as though the foundation therefor had been duly made. We followed this course in *State v. Gilstrap,* 205 S. C. 412, 32 S. E. 2d 163.

It should be noted that although the court was not requested to instruct the jury to disregard the statements made by the solicitor, instructions to this effect were fully given. The jury was told not to consider any reference that was made to any other case; and were charged that they were not to be influenced by any consideration of what leniency, if any, would be given to a defendant if found guilty with recommendation to mercy, followed by a sentence of life imprisonment. They were directed to confine their consideration of the case solely to the evidence brought out on the witness stand and apply the facts to the law.

Even though the jury was clearly instructed by the trial Judge to disregard the statements made by the solicitor, we cannot escape the conclusion, after a careful reading of the record in this case, that the remarks were not only improper but probably affected the verdict. *State v. McGill,* 191 S. C. 1, 3 S. E. 2d 257.

In *State v. Gilstrap, supra* (205 S. C. 412, 32 S. E. (2d) 164), we condemned the following statement made by the

prosecuting attorney in his argument to the jury: "If this boy's color were black, it wouldn't take you fifteen minutes to return a verdict of guilty, and he is not entitled to any more consideration than if his color were black."

In the *Gilstrap case,* the judgment and conviction was affirmed because it clearly appeared from the whole record that no other verdict except that of guilty could have been found upon any reasonable view of the evidence. In that case we said: "The question whether the statements of the prosecuting attorney were fairly calculated to improperly influence the jury, resulting in manifest prejudice, depends in large measure upon the peculiar facts and circumstances of the case."

In the case at bar a Negro boy and his sister were convicted for the killing of a white man, and we are unable to find any justification for making any reference in argument to the jury concerning a difference in race. Nor can we find any justification for the argument that if the defendants were found guilty of murder, but recommended to life imprisonment, that this would not necessarily mean that they would serve a life sentence.

It would appear that the only logical inference to be drawn from such an argument is that, in a case like the one before us, all elements of mercy and extenuating circumstances should be put aside, even if present, because the only certainty of adequate punishment would be a sentence of guilty without recommendation to mercy. In other words, a verdict of murder should be rendered because some other department of the state government might shorten or commute a life sentence.

What was said by us in *State v. Gilstrap, supra,* applies with equal force here with reference to the undoubted good faith of the prosecuting attorney, who, in his zeal, had no intention of doing or saying anything which would prevent appellants from obtaining a fair and impartial trial; but we think he overstepped the bounds of legitimate argument.

This case presented under the facts a question as to whether appellants were guilty of murder or of manslaughter. And we cannot say with any degree of certainty that the verdict may not have been in some measure influenced by the objectionable argument to the jury from which we have quoted.

As another ground for reversal, appellants contend that they are entitled to a new trial because the trial Judge absented himself from the court room during a part of the arguments of counsel to the jury.

It is the duty of the presiding Judge to be present ■■ throughout the trial, to supervise the proceedings and see and hear all that transpires during a criminal trial, where the highest penalty of the law may be inflicted. If for any cause his temporary absence from the court room is essential, even for a brief space of time, he should suspend the trial and leave the jury and the prisoner in the temporary charge of the executive officer of the court. If the trial Judge leaves the court room, goes out of the sight and hearing of the jury and of counsel, and temporarily relinquishes control over the trial, the accused has just cause to complain.

But to constitute such absence from the court room ■ as will vitiate the trial, it must appear to have been of such nature that the judge lost control for the time being of the proceedings of the trial, and the burden is upon the accused affirmatively to show this, or a state of facts from which it necessarily results. *O'Brien v. People,* 17 Colo. 561, 31 P. 230; *Scott v. State,* 47 Tex. Cr. R. 568, 85 S. W. 1060, 122 Am. St. Rep. 717, and note; *Patterson v. Commonwealth,* 139 Va. 589, 123 S. E. 657, annotations 41 L. R. A. 569, 16 Ann. Cas. 627. See also *State v. McAdams,* 167 S. C. 405, 166 S. E. 405.

In our opinion the record in this case does not affirm- ■ atively show that the trial Judge at any time lost control of the proceedings of the trial. Nor has it been shown that the appellants suffered any prejudice on account of such temporary absence of the judge in his cham-

bers adjoining the court room, the door of which was left open.

For the reasons given, the case should be remanded for a new trial.

Judgment reversed.

BAKER, CJ., and STUKES, TAYLOR and OXNER, JJ., concur.