**UNITED STATES of America ex rel. James C. HAYNES, Petitioner-Appellee,**

**v.**

**Charles L. McKENDRICK, Warden, Wallkill State Prison, Walkill, New York, Respondent-Appellant.**

**No. 525, Docket 72-2332.**

United States Court of Appeals, Second Circuit.

Argued March 12, 1973.

Decided June 14, 1973.

Michael Colodner, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for respondent-appellant.

Michael A. Meltsner, New York City, for petitioner-appellee.

Before HAYS, MULLIGAN and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This case is surprising in this day and age since it presents, on appeal by the State from a conditional grant of the writ of habeas corpus in a proceeding under 28 U.S.C. § 2254, the question whether racially prejudicial remarks by a prosecutor in summation constitutionally infected the conviction of appellee. District Judge Motley held that they did so, that there was not harmless constitutional error, and accordingly granted the petition for the writ unless the State within 60 days retried petitioner, the appellee here. Her opinion is printed at 350 F.Supp. 990 (S.D.N.Y.1972). We agree and affirm.

On a rainy evening, December 11, 1965, three men robbed a Niagara, New York, delicatessen. In the process a robber wearing a beige trench coat, a black beret and a mask covering his mouth scooped up $132 from the cash register, hit a customer of the store with a gun, knocking him unconscious, and took his wallet and money. This robber ran out

of the store, pursued by two policemen, but escaped. Meanwhile, two other officers came on the scene in a police car, and after briefly losing sight of the suspect, saw petitioner, Haynes, and arrested him. He was wearing a beige trench coat and black beret but he had no gun, no wallet and no $132. Two black stockings, one of which apparently fitted the description of the "mask," were, however, found in petitioner's pockets along with $25 in change and $73 in bills, 20 of which were and 53 of which were not in his wallet.

Petitioner was identified at the trial by four witnesses, three who saw him in lineups [1] (two of whom said they had known him before the robbery) and one who testified he saw petitioner in front of the store before he put on his "mask." Petitioner's defense was based on an alibi supported by his own testimony, corroborated by three other players, that he had been playing poker and that the coins and bills were winnings. He explained his having the money in assorted pockets by saying that he had kept $17 rent money separately. The socks he and his wife said were put in his pocket when he had bought new gold ones that morning, to match his shirt. That the case was relatively a close one is partially evidenced by the fact that the jury retired at 6:07 p. m. on Friday, March 18, 1966, and returned at 10:42 p. m. with a series of questions concerning (1) the police log's data on the

time of the call to the police car from which petitioner was ultimately seen and the time of the pick-up of petitioner; (2) from which of Haynes' pockets the arresting officer took the socks; and (3) the arresting officer's testimony as to mud on the shoes and pants of Haynes, coupled with a request to have the shoes and pants in the jury room. The jury retired at 11:16 p. m. and did not return with its guilty verdict until 12:55 a. m. on Saturday, March 19, 1966.

The appellant exhausted his remedies in the state courts, arguing in Point II of his brief to the Appellate Division of the State Supreme Court, 4th Department, entitled "Prosecutor's Remarks" that "allusions to race or ethnic background" were prejudicial and referring to the summation as being "replete with racial overtones, undertones, and explicit statements." Indeed, the State did not brief the exhaustion point here.[2]

What, then, were the remarks of the prosecutor to the all-white Niagara County jury, on which the trial court based its finding of a denial of due process? We repeat them here *in extenso* as we believe it necessary for better understanding of our decision (all quotations are from Volume 10 of the transcript of petitioner's trial):

. . . I know that [petitioner's counsel] Mr. Gold, in his experience, he has dealt with people for many years of the colored race. There is something about it, if you have dealt

---

1. Two of the witnesses apparently saw Haynes at a lineup at which he was the only man wearing a raincoat and beret. Petitioner raised several other grounds for relief below including a claim that the lineups were improperly suggestive and that he was denied the right to counsel at the lineup. Since Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), was not decided until after the verdict in appellee's case and is not retroactive, 388 U.S. at 296–301, 87 S.Ct. 1967, petitioner's claim on this issue cannot now be heard. His failure to raise this claim in the state courts, moreover, would preclude his assertion of it under 28 U.S.C. § 2254(b). Appellee also claimed that the trial court's granting of

dismissal as to a codefendant and that admission of the confession of a codefendant who, however, testified favorably for the appellee, violated his constitutional rights, but he has abandoned those claims —correctly, we think—on this appeal.

2. The trial court held that while a number of non-racial remarks by the prosecutor might have constituted reversible error in a trial in the federal courts, the errors did not rise to constitutional dimensions, relying upon Buchalter v. New York, 319 U.S. 427, 431, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943), and United States ex rel. Castillo v. Fay, 350 F.2d 400, 401 (2d Cir. 1965), cert. denied, 382 U.S. 1019, 86 S.Ct. 637, 15 L.Ed. 533 (1966).

with colored people and have been living with them and see them you begin to be able to discern their mannerisms and appearances and to discern the different shades and so on. Any of you that have never been exposed to them would never be able to. I don't see, I have been exposed to some degree, that isn't what I am getting at. What I am getting at is those who are living with them, dealing with them, and working with them in a sense, have a much better opportunity to evaluate what they see to identify what they see. (27–28.)

* * * * * *

Now, counsel for the defendants told you, and Attorney Gold is probably as well versed with the colored race as any man I know in the legal profession. He knows their weaknesses and inability to do certain things that maybe are commonplace for the ordinary person to do or remember or know certain things. (38.)

* * * * * *

. . . Here she is, a young girl about 13 [referring to a prosecution witness who was black]. And I know that you have recalled this young McCray girl who is the tall sister of Jones. That young lady [also black] had her first baby at 15. She is now married at 16 with another baby on the way. The maturity among these people becomes quite evident quite quickly. Here is a young girl interested in all the young—or ought to be, in the young men of her circle of friends or environment . . . (40–41.)

* * * * * *

It gets confusing when you talk to some of these youngsters like that because they don't express themselves

as clearly as you and I might possibly be able to do so. (41–42.)

* * * * * *

Eyvonne Martin true enough is 13 years old. Again I point to the fact she is a colored girl. She knows her own. She knows the young bucks in that neighborhood and she knew Terry Cox [petitioner's codefendant]. (43–44.)

* * * * * *

I know that it is the custom and the habit of many colored people to try and straighten their hair. I don't know what the reason for it is. But in any event it is not uncommon to observe colored people with a heavy pomade grease or hair dressing in their hair. It is also not uncommon to find colored people with somewhat exotic hair-dos, male and female. Most of the exotic hair-dos take the form of a skull cap type hairdo, plastered down. You may have seen this. Others are taking the trend of the current day, of the long hair. It seems to be a fad. May I say that I cannot participate in that. The tendency on the part of these faddists, if I can call them that, is that they use this black bandana type, you have seen it, to hold the hair down. The effect of this grease is to straighten that hair out. And that would bring the hair down. The long hair as described by Mrs. Balon, being pulled down, plastered down on the side of the head and by Investigator Demler, who described it as long. This is not the type of sideburns that we usually think of when we think of sideburns. It probably operates much as bangs operate on a lady. They do not grow out of your forehead. They come off the top and dress down. . . . (79–81.)[3]

---

3. We must bear in mind what these remarks consisted of and their implications—not incidentally, this was an all-white jury trying a black man—to a listener supposedly trying to decide a case without bias, prejudice, passion or discrimination. Remember, it is "them" to whom this prosecutor was referring, "them" being "colored people." He says if you've been living with and dealt with "them" you can "discern the different shades and so on." (We white people don't have "different shades.") The defense attorney is said by the prosecutor to "know their

We agree with the district court that the prosecutor's remarks introduced race prejudice into the trial and thereby denied petitioner his constitutional right under the due process clause to a fair trial. There can be no doubt that the prosecutor's remarks would have required reversal in a federal court appeal under the decisions of this and other federal courts. *See* United States v. Grey, 442 F.2d 1043 (6th Cir.), cert. denied sub nom. Williams v. United States, 400 U.S. 967, 91 S.Ct. 380, 27 L.Ed.2d 387 (1970).[4] *See also* United States v. Lamerson, 457 F.2d 371 (5th Cir. 1972); United States v. Grunberger, 431 F.2d 1062, 1068 (2d Cir. 1970). Skuy v. United States, 261 F. 316 (8th Cir. 1919), contained a prosecutorial statement comparable in its instillation of racial prejudice with this one; in that case the prosecutor implied that the testimony of one Christian soldier should be believed even though disputed by four Jewish witnesses simply because of the different religious affiliations of the witnesses. In both *Skuy* and *Grunberger, supra,* reversal was had despite a failure on the part of the defendant to object properly (perhaps by virtue of unconscious acquiescence on the part of the defense attorney in the prosecutor's objectionable remarks), and here too defense counsel's failure to object does not dispose of the issues raised by this habeas petition. This case goes well beyond the classic United States v. Antonelli Fireworks Co., 155 F.2d 631, 637–638 (2d Cir.),

---

weaknesses and inability to do certain things that maybe are commonplace for the ordinary person"—imagine, the "ordinary person"! *Cf.* Simmons v. State, 14 Ala.App. 103, 104, 71 So. 979 (1916) ("You must deal with a Negro in the light of the fact that he is a Negro, and applying your experience and common sense" held prejudicial error). What he means is the white person, of course. And "to do or remember or know certain things." So "they," the "colored people," are unable to "do," "remember" or even "know" certain things; they have "weaknesses" unlike you white jurors and I, a white prosecutor—they're inferior to us superiors (and hence more likely to steal like this defendant?). "The maturity among these people becomes quite evident quite quickly"—again, "they" are different from you and me. "Again, I point to the fact that she is a colored girl"—as if you needed any reminding—"She knows the young bucks in that neighborhood . . ." *Cf.* Harris v. State, 22 Ala.App. 121, 122, 113 So. 318 (1927) (". . . a great big buck Negro didn't have any need to throw a gun on that little fellow," along with other remarks, held prejudicial error). The "young bucks" at least are not said to have "shuffled" or "danced" or "to be always laughing" or to be lazy, or to fit some other white racially prejudiced stereotype, even if the connotation of "young bucks" is one of fastness, looseness, perhaps coupled (*cf.* United States v. Grey, 422 F.2d 1043 (6th Cir. 1970) (discussed in note 4 *infra*)) with going out with white women (did it ever occur to you that this defendant might have gone out with a white woman; we'd better convict him). And then some talk about colored people and their hair-straightening and their "somewhat exotic hair-dos, male and female"—unlike us white people (did you ever see a white person with an exotic hair-do, perish the thought, at least not right here in River City). "Most of the hair-dos take the form of a skull cap type hair-do, plastered down . . . . Others are taking the trend of the current day, of the long hair" (hippies, too, are not to be trusted). But this defendant, oh yes—"The long hair as described by Mrs. Balon, being pulled down, plastered down on the side of the head and by Investigator Demler, who described it as long." Again, "This is not the type of sideburns that we (white people) usually think of when we" (as opposed to "them") "think of sideburns." The summation was immersed in prejudice, some of it subconscious perhaps, but prejudice nevertheless.

4. In *Grey,* reversal occurred where the prosecutor asked a character witness for the defendant whether he knew "that Grey, a Negro and a married man, was 'running around with a white go-go dancer.'" 422 F.2d at 1044–1045. The court said: "At best, the entire question was a magnificent irrelevance . . . . At worst, the gratuitous reference to the race of the go-go dancer may be read as a deliberate attempt to employ racial prejudice to strengthen the hand of the United States government. The United States needs and desires no such aid." 422 F.2d at 1045.

cert. denied, 329 U.S. 742, 67 S.Ct. 49. 91 L.Ed. 640 (1946), where the prosecutor's closing statement was an exhortation in wartime to the jury as patriotic Americans in disparagement of the Italian-American defendant. Judge Frank's eloquent dissent, it will be recalled, argued among many other things that a prosecutor "should not be permitted to summon that thirteenth juror, prejudice." 155 F.2d at 659.[5] *See also* Annot., 45 A.L.R.2d 303, 322–68 (1956); ABA Project on Standards for Criminal Justice, The Prosecution Function and the Defense Function §§ 5.8(c) and (d), commentary at 128–29 (1970).

■ Racial prejudice can violently affect a juror's impartiality and must be removed from the courtroom proceeding to the fullest extent possible. *See generally* G. Allport, The Nature of Prejudice (1955); B. Bettelheim & M. Janowitz, Social Change and Prejudice (1964); S. Blackburn, White Justice; Black Experience Today in America's Courtroom (1971); J. Kovel, White Racism, A Psychohistory (1970). It negates the defendant's right to be tried on the evidence in the case and not on extraneous issues. ABA Standards, *supra*, at 129. More than just harm to the individual defendant is involved, however. For the introduction of racial prejudice into a trial helps further embed the already too deep impression in public consciousness that there are two standards of justice in the United States, one for whites and the other for blacks. Such an appearance of duality in our racially troubled times is, quite simply, intolerable from the standpoint of the future of our society.

Proceeding from the major premise that the remarks of the prosecutor were prejudicial and would have resulted in reversal had they been made in the federal courts, we must inquire whether, as the State seems to suggest, to result in reversal racially biased remarks of a prosecutor in a state court case must be shown to have had a greater probability of prejudice than remarks on a direct appeal in the federal courts.[6] In our analysis we shall refer exclusively to federal court decisions which overturned state court decisions on fourteenth amendment grounds.

We commence our analysis of the application of the fourteenth amendment to prosecutorial summations in state courts with a considerable background of cases—none of them involving prosecutor's remarks, to be sure—overturning convictions on fourteenth amendment grounds where racial prejudice was a major factor in the fiber of the trial. Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923);[7] Powell v.

5. Society may be endangered as much by the violence of its friends as of its enemies, and an appeal to prejudice as a factor in determination of guilt is, in the final analysis, an appeal to violence. The majesty of the law must remain unchallenged. It is threatened by each trial where there is a justified doubt of fairness and impartiality.

People v. Malkin, 250 N.Y. 185, 201, 164 N.E. 900, 907 (1928) (Lehman, J.).

6. By framing the question in this fashion we distinguish the cases in which the conduct of state prosecutors, not involving appeals to racial prejudice, has been held not to reach the limits of violating constitutionally guaranteed due process. *See* United States ex rel. Castillo v. Fay, *supra* note 2, 350 F.2d at 401, and cases cited. We note also that a number of the prosecutor's remarks in this case—not appealing to racial prejudice—would have justified reversal in a federal appeal, but we do not, on this collateral attack, reach the question whether the resulting prejudice assumed constitutional dimensions. More than once, for example, the prosecutor evinced his personal belief in petitioner's guilt. We thus agree with the district court's treatment of the summation, differentiating between the racial and non-racial remarks.

7. . . . On November 3 the petitioners were brought into Court, informed that a certain lawyer was appointed their counsel and were placed on trial before a white jury—blacks being systematically excluded from both grand and petit juries. The Court and neighborhood were thronged with an adverse crowd that threatened the most dangerous consequences to anyone interfering with the desired result. The counsel did not venture to demand delay or a

Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).[8] We also draw upon those cases that hold a fair trial to be a fundamental requisite of due process of law. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (judge not impartial); Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (coerced confession); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel in all felony cases); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (televising defendant's confession before trial requires change of venue); Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (two deputy sheriffs who testified against defendant supervised jury); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (televising and broadcasting of trial); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1965) (pre-trial and in-trial publicity); Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed. 2d 420 (1965) (bailiff's improper remarks to jury).

But all the case law is not as significant as the underlying history and purpose of the fourteenth amendment; it was and is centrally concerned with protecting the rights of black Americans in the states particularly in connection with the application of the law. *E. g.*, Loving v. Virginia, 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). In the intro-

ductory speech in the debate on that great amendment, Thaddeus Stevens, when he came to discuss the first section which contains the due process and equal protection clauses, led by saying:

I can hardly believe that any person can be found who will not admit that every one of the provisions is just. They are all asserted in some form or other, in our Declaration or organic law. But the Constitution limits only the action of Congress, and is not a limitation on the States. This amendment supplies that defect, and allows Congress to correct the unjust legislation of the States, so far that the law which operates on one man shall operate *equally* upon all. Whatever law punishes a white man for a crime shall punish the black man precisely in the same way and to the same degree. Whatever law protects the white man shall afford "equal" protection to the black man. Whatever means of redress is afforded to one shall be afforded to all. Whatever law allows the white man to testify in court shall allow the man of color to do the same. These are great advantages over their present codes. Now different degrees of punishment are inflicted, not on account of the magnitude of the crime, but according to the color of the skin. Now color disqualifies a man from testifying in courts, or being tried the same way as a white man . . . .

---

change of venue, to challenge a juryman or to ask for separate trials. He had had no preliminary consultation with the accused, called no witnesses for the defence [sic] although they could have been produced, and did not put the defendants on the stand. The trial lasted about three-quarters of an hour and in less than five minutes the jury brought in a verdict of guilty of murder in the first degree . . . . Moore v. Dempsey, 261 U.S. 86, 89, 43 S.Ct. 265, 266, 67 L.Ed. 543 (1923).

8. The petitioners . . . are negroes charged with the crime of rape, committed upon the persons of two white girls . . . . [287 U.S. at 49, 53 S.Ct. at 57] Before the train reached Scotts-

boro, Alabama, a sheriff's posse seized the defendants and two other negroes . . . . The sheriff thought it necessary to call for the militia to assist in safeguarding the prisoners . . . . It is perfectly apparent that the proceedings, from beginning to end, took place in an atmosphere of tense, hostile and excited public sentiment . . . . [287 U.S. at 51, 53 S.Ct. at 57] However guilty defendants, upon due inquiry, might prove to have been, they were, until convicted, presumed to be innocent. It was the duty of the court having their cases in charge to see that they were denied no necessary incident of a fair trial. [287 U.S. at 52, 53 S.Ct. at 58]

Quoted in 1 Statutory History of the United States Civil Rights 222–23 (B. Schwartz ed. 1970).

This is of course the point where the due process and equal protection clauses overlap or at least meet [9]—where a criminal trial is affected by racial prejudice, either in the underlying procedure, the atmosphere surrounding the trial or otherwise. Thus, the equal protection cases are not altogether inapposite. Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879) (jury selection discriminatory); Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) (systematic exclusion of Negroes from grand and petit jury lists); Johnson v. Virginia, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963) (per curiam) (segregation in the courtroom); Hamilton v. Alabama, 376 U.S. 650, 84 S.Ct. 982, 11 L.Ed.2d 979 (1964) (discrimination by prosecutor in addressing a black witness by her first name); Whitus v. Georgia, 385 U.S 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (grand jury selection discriminatory); Sims v. Georgia, 389 U.S. 404, 407–408, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (per curiam) (grand and petit jury selection discriminatory); Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (Negroes excluded from grand jury). If there is anything more antithetical to the purposes of the fourteenth amendment than the injection against a black man of race prejudice—whether in a procedure underlying, the atmosphere surrounding, or the actual conduct of, a trial—so that he, in the words of Senator Stevens, is deprived of the right of "being tried the same way as a white man," we do not know what it is.

■ Thus, the purpose and spirit of the fourteenth amendment requires that prosecutions in state courts be free of racially prejudicial slurs in argument. The standard for state prosecution in this regard is thus as high as the rigorous standard required of the federal courts by the fifth amendment's due process clause.

■ But the State argues, citing Buchalter v. New York, 319 U.S. 427, 431, 63 S.Ct. 1129, 1132, 87 L.Ed. 1492 (1943), which in turn quoted Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 242, 87 L.Ed.2d 268 (1942), that "it is not asking too much that the burden of showing essential unfairness . . . be sustained not as a matter of speculation but as a demonstrable realty." At least since In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (one man judge-grand jury unconstitutional), however, "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent *even the probability of unfairness.*" (Emphasis supplied.) We cannot of course know what was in the minds of the jury's members when they came to pass upon Haynes' guilt or innocence. Taken individually, probably each would have denied any prejudice. *Cf.* United States v. Antonelli Fireworks Co., *supra*, 155 F.2d at 655 n. 35 (Frank, J., dissenting). But we are totally satisfied that there was a strong probability of prejudice here, and probability of prejudice we believe to be the correct test when the evidence of guilt as in this case is not overwhelming. We cannot require that each juror now be examined as to his state of mind at the time of trial. Indeed, these jurors could not, the cases say, impeach their own verdict, even if they had recognized their own prejudice when they saw it. *See* United States ex rel. Owen v. McMann, 435 F.2d 813, 818–819 (2d Cir. 1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971). It is the cold restatement of the remarks in the record, without inflection or intonation, on which we must

9. *See* Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) (" . . . discrimination may be so unjustifiable as to be violative of due process").

rely to determine the probability of prejudice and here we find it.

The State also contends that the statements of the district attorney were "engendered by the blatant racial appeals of counsel for petitioner and were intended for the rehabilitation of the State's own witnesses," even though it concedes that the prosecutor's remarks were "inappropriate." The State fails to refer us to any comment by Haynes' attorney that was a "blatant racial appeal."[10] Some of the prosecutor's remarks were undoubtedly, however, in rehabilitation of the State's witnesses; defense counsel had quite correctly referred to the 13-year-old girl Eyvonne Martin as a witness who changed her story in a number of different ways and whose memory (since she didn't remember the name of the street two blocks from where she lived) was unreliable. The white eyewitness's testimony he also attacked partly on the basis that it is difficult for white people to identify "a colored person." But rehabilitating Eyvonne Martin by allusions to the early maturity of "these people"[11] and her knowledge of "her own . . . the young bucks in that neighborhood"[12] coupled with a reference to the weakness and inability of "them" to do or know things that are "commonplace for the *ordinary person*" (emphasis supplied) to know or do served to dichotomize the people in the courtroom, to divide them into black and white. *Cf.* Moseley v. State, 112 Miss. 854, 858, 73 So. 791, 792 (1917) (". . . This injection of race questions into court trials has been uniformly condemned by this court."). The argument of defense counsel relating to identification could justify in reply reference to the particular defendant's peculiar features which made him especially noticeable to a white person—such as his "sideburns"—a reference that was made; it does not justify, in our opinion, the repeated references to "colored people" *as a group* trying to straighten their hair, or wearing "exotic hairdos," or having sideburns that are not the type "that we usually think of when we think of sideburns." In other words, answer to the identification argument did not require jurors to view "colored people" as an entity separate and apart from themselves, with the natural concomitant that the defendants would be viewed by the jury members as coming from a distinct, a different community from themselves. *Cf.* State v. Hinton, 210 S.C. 480, 486, 43 S.E.2d 360, 361 (1947) ("I do not ask you to convict the defendants merely because a white man was killed by a negro" held reversible error). Provocation by the defense may be considered as a factor in weighing the prosecutor's conduct in summation. *See* United States v. Benter, 457 F.2d 1174, 1176 (2d Cir.), cert. denied, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 82 (1972); *see also* Buchalter v. New York, *supra,* 319 U.S. at 431, 63 S.Ct. 1129. *But see* United States ex rel. Castillo v. Fay, 350 F.2d 400, 401 (2d Cir. 1965), cert. denied, 382 U.S. 1019, 86 S.Ct. 637,

---

10. The defense attorney made quite a perceptive argument attacking each prosecution witness's opportunity for observation, memory, suggestibility, and the like, emphasizing the lineup's suggestibility, the conflicts between witnesses, and pointing out that $60, the customer's wallet and the robber's gun were not found. Just what the State means by a "blatant racial appeal" is unclear. If it means that a defense attorney cannot attack a juror's potential racial prejudice by direct reference to it and an appeal to cast it aside, or that by doing so, the defense invites a counter attack by way of an appeal to race prejudice, this suggestion falls on deaf ears in this court. What may have

been Clarence Darrow's finest summation was just such an argument, made when he was defending the Sweet case in Detroit in 1926. *See* You Can't Live There in Attorney for the Damned 229–63 (A. Weinberg ed. 1957).

11. The prosecutor referred to the "young McCray girl [a sister of a codefendant] who . . . had her first baby at 15." He then went on to say, in what is surely a racial slur, "She is now married at 16 with another baby on the way" to dramatize the early maturity of "these people."

12. The appellee, Haynes, was 32 at the time of the robbery; Martin apparently knew Cox, a codefendant, who was 17.

15 L.Ed.2d 533 (1966). But here there was no provocation, and, while the prosecutor could legitimately reply to the identification argument by the defense, his reply went beyond the bounds of propriety, passing those of due process, here.

■ Finally the State argues that there was harmless constitutional error [13] in the sense that the evidence of guilt was so overwhelming that Haynes could not have been prejudiced by any of the prosecutor's remarks. *Cf.* United States v. Benter, *supra*, 457 F.2d at 1178; United States v. Frascone, 299 F.2d 824, 828 (2d Cir. 1962), cert. denied, 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1963). The short answer to this argument is that our review of the record satisfies us that the evidence was by no means so clear as the prosecution would have it. The identification of petitioner was not overwhelmingly persuasive—the black beret he was wearing was not uncommon in the neighborhood and many raincoats are "beige." Petitioner was not found with the robber's gun or customer's wallet or money in an amount similar to that taken. Petitioner presented, moreover, an alibi supported by the testimony of several witnesses. The jury, moreover was not so ready to convict, since it took several hours of deliberation before guilty verdicts were brought back.[14] We totally disagree with the State's contention in the next to concluding sentence in its brief, that "It is clear from the evidence at trial that petitioner had a hopeless case." Rather, we think, the

probability of prejudice was sufficiently great, and the case sufficiently close, that the defendant, appellee here, should be given a new trial as ordered by the district court under any applicable "harmless error" standard. Harrington v. California, 395 U.S. 250, 254, 89 S. Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Accordingly we need not decide whether jury verdicts tainted by racially prejudicial statements by the prosecutor should be measured by the harmless error test, but rather should receive automatic reversal. Racially prejudicial remarks are, however, so likely to prevent the jury from deciding a case in an impartial manner and so difficult, if not impossible, to correct once introduced, that a good argument for applying a more abolute standard may be made. *See* Note, Harmless Constitutional Error: A Reappraisal, 83 Harv. L.Rev. 814, 820–24 (1970).

Thus, we affirm the judgment below.

Judgment affirmed.

MULLIGAN, Circuit Judge (concurring):

I concur in the opinion of Judge Oakes. I cannot agree with Judge Hays that the comments of the prosecutor here, while admittedly vulgar and revolting, do not rise or perhaps fall to the level of unconstitutionally prejudicial conduct. The majority opinion sets forth in detail the demeaning comments of the prosecutor who was trying black men before an all

---

13. This is not a case like Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); or Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), all of which involved *evidentiary* prejudice, and in each of which the challenged evidence was corroborative or cumulative only. As the State concedes, where the constitutional error is a denial of fundamental fairness, and threatens the integrity of the fact evaluation and guilt adjudication process itself, there is by definition obvious prejudice. United States ex rel. Maselli v. Reincke, 383

F.2d 129, 133 n. 4 (2d Cir. 1967). *See generally* Note, Harmless Constitutional Error: A Reappraisal, 83 Harv.L.Rev. 814 (1970).

14. The argument from the length of jury deliberations—used so often—cuts both ways, however, since longer deliberations, especially when coupled with questions, as here, relating to the evidence, may indicate that the jury was considering the merits rather than being governed by its prejudices. On the other hand, who is to say that prejudice may not have tipped the scales in the final analysis—"oh, you can't believe a thing *they* say."

white jury. In light of his prior comments, the closing sentences of the summation to the jury constitute a blatant appeal to racial prejudice.

> We cannot take these people out of the community unless you twelve people sitting in judgment on these matters decide these things have got to stop. I ask you to find these defendants guilty on all counts of this indictment and you can go home with the clearest conscience that you have ever had.*

There is no doubt after reading the entire charge that "these people" are not simply these defendants but these black people. There is no room for this in a state court or in a federal court and the paucity of direct authority for finding it constitutionally offensive, is attributable hopefully to the fact that prosecutors today rarely, if ever, seek to introduce the poison of prejudice into the deliberative processes of the jury. I am persuaded that this was done here and that this petitioner was not simply a member of a race which was viewed with contempt but that he was denied due process.

HAYS, Circuit Judge:

I reluctantly dissent.

Unlike the majority I can find no suggestion in what the prosecutor said during the trial that, for example, blacks are more likely to commit crimes than whites or that black witnesses are less reliable than white. What I find is such dismal (and untrue) clichés as that all blacks look alike or that all black girls are sexually promiscuous or that black hairdos are particularly unattractive.

Influenced by understandable outrage at the nauseating remarks of the prosecutor, my colleagues have been led to disregard the difference between revolting vulgarity and unconstitutionally prejudicial conduct.

* For an interesting parallel see the last sentence of the Commonwealth's summation in the Sacco-Vanzetti trial:
> Gentlemen of the jury, do your duty. Do it like men. Stand together, you men of Norfolk!

characterized by Felix Frankfurter as "an appeal to their solidarity against the alien." F. Frankfurter, The Case of Sacco and Vanzetti 64 (Little, Brown & Co. 1962).