101 F.3d 1392
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
Santos GONZALEZ, Petitioner-Appellant,
v.
Robert KUHLMAN, Superintendent of the Sullivan Correctional
Facility, Respondent-Appellee.
 No. 95-2282.
 United States Court of Appeals,
Second Circuit.
 July 2, 1996.
 
 Kim P. Bonstrom, Bonstrom, Murphy & Gordon, New York City, for Appellant.
 Patrick Barnett-Mulligan, Assistant Attorney General of the State of New York, Albany, NY, for Appellee.
 Present: MINER, JACOBS, PARKER, Circuit Judges.
 UPON CONSIDERATION of this appeal from a judgment of the United States District Court for the Western District of New York, it is hereby
 ORDERED, ADJUDGED, AND DECREED that the judgment be and it hereby is AFFIRMED.
 This cause came on to be heard on the transcript of record and was argued by counsel.
 Petitioner-appellant Santos Gonzalez appeals from a judgment of the United States District Court for the Western District of New York (Curtin, J.) dismissing Gonzalez' 28 U.S.C. § 2254 petition for a writ of habeas corpus.
 
 
 1
 The evidence presented at trial demonstrated that, on July 28, 1980, Gonzalez was driven by Glenn King to Tillinghast Place in Buffalo, New York. At about 11:25 a.m. on that day, 16-year-old Tod Barber was walking home from a class to his residence at 75 Tillinghast Place. As Tod approached his home, he noticed a car with no one inside parked in the street. When Tod entered his house, he observed that there were signs of a break-in. Tod then ran to a neighbor's house and called the police.
 
 
 2
 City of Buffalo police officers William Collins, Jeremiah Hassett, and Ronald Clark responded to the call. After arriving at the scene, Clark entered the house, and, as he walked up the stairs, he saw a man run from one room into another on the second floor. At trial, Clark testified that a photograph of King "strongly" resembled this man. Clark then saw a second man emerge from a room, wearing green khaki fatigue clothing and carrying a pistol. At trial, Clark identified Gonzalez as this man.
 
 
 3
 Meanwhile, Collins had walked into the backyard of the house, where he exchanged gunfire with one of the men in the house. Although Collins could not see the face of the man who shot at him, Collins observed that the man was wearing a "green Army fatigue-type jacket." Clark, who was still in the stairway, heard these shots coming from the bedroom and outside. Gonzalez then appeared in the doorway of the bedroom and pointed his gun at Clark. Clark attempted to shoot Gonzalez, but his gun misfired, and Clark stumbled backwards. Although Clark testified that he was unable to hear any shots fired as he fell backwards, two bullet holes later were found in the location where Clark had been standing when Gonzalez pointed his gun at him.
 
 
 4
 Members of a SWAT team subsequently entered the house and found Gonzalez lying injured in a third floor bedroom. A green fatigue jacket and a revolver also were found in the bedroom with Gonzalez. After Gonzalez was taken to the hospital, x-rays were taken of the bullets lodged in his body, and the bullets matched the type of ammunition used by Collins.
 
 
 5
 Gonzalez disputed the government's version of these events at trial. He claimed that King had offered to drive him home, and that, on the way, King stopped at Tillinghast Place. Gonzalez testified that, as he waited in the car, he saw a boy walk into the house that King had entered. Gonzalez claimed that he himself entered the house after he became impatient while waiting for King.
 
 
 6
 During summation, the prosecutor referred to Tod's testimony that he did not see Gonzalez sitting in the car in the street. In an effort to show that it was unlikely that Tod would not have noticed Gonzalez, the prosecutor made the following remarks:
 
 
 7
 Tod went by and didn't see him the first time. Tod went by and didn't see him the second time, and he was looking. Not looking for somebody, he was looking at the car, and he didn't notice anybody, and I submit to you a white middle class kid would notice a Puerto Rican sitting in a car in their neighborhood in an old beat up car. That's not prejudice. That's not bigotry, I should say. Maybe it's prejudice. Maybe it's an acknowledgment of all our inherent prejudices, but that's common sense. Of course he would notice something like that. It might make him a little uneasy. We all fall prey to being a little bit leary [sic] to what, you know, we believe to be society's propensities. It doesn't mean that we are bigots because of it. We have to control it. It becomes bigotry when we don't control our prejudices. So, Tod doesn't see him.
 
 
 8
 In November of 1980, Gonzalez was convicted in New York State Supreme Court of one count of attempted murder in the first degree, one count of attempted assault in the first degree, one count of burglary in the second degree, and two counts of criminal possession of a weapon in the second degree. He was sentenced to a minimum term of 25 years, with a maximum term of life imprisonment, for attempted murder in the first degree. He also was sentenced to a consecutive term of a minimum of seven and one-half years, with a maximum term of 15 years, for burglary in the second degree. His sentences on the other counts were made concurrent.
 
 
 9
 In April of 1981, Gonzales appealed to the Appellate Division, Fourth Department. He argued that his conviction should be vacated due to, inter alia, prosecutorial misconduct. On December 23, 1988, the Appellate Division affirmed Gonzalez' conviction in a memorandum decision. People v. Gonzalez, 538 N.Y.S.2d 706 (4th Dep't 1988). Leave to appeal to the New York State Court of Appeals was denied on April 4, 1989.
 
 
 10
 On July 31, 1989, Gonzales filed a § 2254 petition in district court, alleging, inter alia, that there had been prosecutorial misconduct. In a Report and Recommendation dated September 16, 1994, the magistrate court recommended that the petition be dismissed in its entirety. The district court adopted the magistrate court's Report and Recommendation and dismissed the petition. Judgment was entered on April 6, 1995.
 
 
 11
 On appeal, Gonzalez contends that his constitutional rights were violated by the prosecutor's reference to his race and by the prosecutor's other allegedly prejudicial comments during summation. We reject this contention.
 
 
 12
 Gonzalez argues that it was constitutional error for the prosecutor to refer to his race during summation. We have held that "racial remarks in a prosecutor's summation can constitute a violation of a defendant's right under the Due Process Clause to a fair trial." McFarland v. Smith, 611 F.2d 414, 416 (2d Cir.1979) (citing United States ex rel. Haynes v. McKendrick, 481 F.2d 152 (2d Cir.1973)). In McFarland, we stated that, "given the general requirement that the race of a criminal defendant must not be the basis of any adverse inference, any reference to it by a prosecutor must be justified by a compelling state interest." Id. at 417.
 
 
 13
 In the present case, we do not think that the prosecutor's reference to the race of Gonzalez amounted to constitutional error. The prosecutor mentioned the fact that Gonzalez was Puerto Rican in order to buttress Tod's testimony that he did not notice anyone in the car that he had observed parked in the street. Although the prosecutor then remarked how society must control its prejudices, these comments merely were rambling observations. The prosecutor was not trying to argue that any adverse inference should be made against Gonzalez on account of his race. Cf. Haynes, 481 F.2d at 155 (constitutional error where prosecutor described to the jury how "colored people" have certain mannerisms and habits). Accordingly, the prosecutor's reference to Gonzalez' race did not violate his constitutional rights.
 
 
 14
 Gonzalez also contends that the prosecutor made other prejudicial comments during summation that deprived him of a fair trial. For instance, Gonzalez argues that it was improper for the prosecutor to refer to him as a "liar" during summation. However, we have stated that "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." United States v. Peterson, 808 F.2d 969, 977 (2d Cir.1987). In view of the defense counsel's attacks on the credibility of the prosecution witnesses, we do not think that the prosecutor's references to the credibility of Gonzalez were improper. Gonzalez also contends that it was improper for the prosecutor to assert that Gonzalez had moved around the house during the shoot-out like a "wild animal," and to describe him as a "jailhouse lawyer" who is "hoping to beat" the system. Although these comments by the prosecutor contained colorful language, such language did not exceed the bounds of proper argument. We also do not think that any of the other allegedly prejudicial comments made by the prosecutor during summation were improper. Accordingly, the district court properly dismissed Gonzalez' § 2254 petition.