Billie Ruth JOHNSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 56324.

Court of Criminal Appeals of Texas, Panel No. 3.

June 11, 1980.

Rehearing Denied Sept. 10, 1980.

---

**130**

Allan K. Butcher, Fort Worth, for appellant.

Tim Curry, Dist. Atty., Marvin Collins, Jack Q. Neal, Jack J. Heinemann and Candyce W. Howell, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for murder. The punishment is imprisonment for fifteen years.

Appellant contends that the trial court erred by permitting the prosecutor to refer to and display before the jury a pistol which had been held inadmissible in evidence. Appellant also contends that evidence of the deceased's use of marihuana was erroneously excluded, and that the prosecutor engaged in improper jury argument.

The evidence establishes that appellant fatally shot Sammie Lee Chopp, Jr., during the early morning hours of March 28, 1976. The shooting took place in the duplex apartment appellant and the deceased shared. Howard Chopp, the brother of the deceased, witnessed the shooting. He testified that his brother and the appellant began arguing after she returned to the apartment at approximately 3:00 a. m. A struggle ensued, during which the two combatants fell to the floor. The witness heard three muffled shots, after which appellant stood up and fired three more shots into the prone body of the deceased.

Appellant admitted shooting the deceased, but contradicted Howard Chopp's version of the events. She testified that the deceased was "crazy" due to the use of marihuana, and had attacked her and was trying to kill her. She testified that she shot the deceased in self–defense.

Fort Worth police officers Dickie Gatlin and Jimmy Spinks testified that they discovered a revolver and six spent cartridges during a search of the apartment a few hours after the shooting. Spinks identified State's exhibit six as the revolver in question, and testified that at the time it was found it had been recently fired. At no time did appellant object to this testimony or to the display of the pistol before the jury. In fact, appellant carefully cross–examined both witnesses about the weapon.

The prosecutor offered State's exhibit six in evidence during his redirect examination of Spinks. Appellant objected to the introduction of the pistol on the ground that the search of the house had been unconstitutional, and the objection was sustained. Appellant then requested that the pistol be removed from the presence of the jury.

■ Appellant contends that the prosecutor was erroneously permitted to display or refer to the pistol on three occasions after it had been ruled inadmissible. The first instance occurred during the prosecutor's questioning of Howard Chopp. The prosecutor asked the witness:

"Q. Mr. Chopp, I will show you what has been marked as State's Exhibit Number Six and ask you if this is the pistol you saw that evening?

"A. Yes, that looks like it.

"Q. It looks like it?

"A. Yes.

"Q. Mr. Chopp, I will also show you what has been marked as State's Exhibits One through Five and ask you if you know the person whose picture these depict?

"A. Yes, that is my brother, Sammie Lee Chopp, Jr.

"Q. Could these pictures—
"MR. DUSHMAN: Excuse me
(Discussion at the bench)
"THE COURT: All right. The jury go to the jury room, please."

Outside the presence of the jury, appellant moved for a mistrial because of the display of the pistol but the motion was overruled.

The second reference to the pistol occurred during the prosecutor's cross–examination of appellant, when he asked her:

"Q. There is no denial that you did shoot him with a pistol, is that right?

"A. Yes, sir.

"Q. There is no denial that you did empty the pistol?

"A. Yes.

"Q. Now do you have that pistol this date?

"A. No, sir.

"Q. All right. Have you seen it recently?
"MR. DUSHMAN: Excuse me, Your Honor. That is trying to get in the record what they can't do.
"THE COURT: Overruled. I will permit him to answer the question.
"BY MR. NEAL:

"Q. Have you seen the pistol recently?

"A. I saw it yesterday.

"Q. You saw it yesterday?

"A. Yes, sir."

The third reference to the pistol occurred during rebuttal testimony by Officer Spinks. The prosecutor questioned Spinks about his search of the murder scene as follows:

"Q. Well, knowing that there had been a shooting your primary concern was locating the weapon?

"A. Yes, sir.

"Q. And at that time you weren't aware that there was anything such as marijuana involved in this case, is that true?

"A. Yes, sir.

"Q. That is not true?

"A. I was not aware it was involved, sir.

"Q. So in your search when you searched and you found a pistol that you have talked about when you all came to the window—at that point you were satisfied with at least that portion of your investigation?

"A. Yes, sir."

Appellant voiced no objection to this testimony.

Appellant contends that the display of and references to the pistol after it was held inadmissible was a deliberate effort by the prosecutor to prejudice appellant and deny her a fair trial. However, appellant permitted the police officers to fully testify to the discovery of the pistol, and to display and identify the pistol before the jury, without objection. Indeed, appellant also questioned the officers about the pistol. Thus, appellant's objection to the admission of the pistol in evidence came too late. *Hernandez v. State*, 538 S.W.2d 127 (Tex. Cr.App.1976). The display of the pistol after it had been held inadmissible reflects no credit on the prosecuting attorney, but it could hardly have prejudiced appellant in light of the earlier testimony to which no objection was made. See *Cain v. State*, 549 S.W.2d 707 (Tex.Cr.App.1977).

■ Appellant testified that the deceased's attack on her was precipitated by his use of marihuana. In this connection appellant contends that the trial court erred in refusing her to permit her uncle, George Garrett, Jr., to testify before the jury that

the deceased was an habitual smoker of marihuana, and that under the influence of the drug the deceased's eyes would become red and he would become violent and aggressive.

Five witnesses, appellant, her father, her uncle, the deceased's brother, and Shelly Morgan, a friend of appellant, testified that the deceased had physically attacked appellant on various occasions. Both appellant and Morgan testified that the deceased was a frequent user of marihuana and that he would become violent when under the influence of the drug, and described several marihuana–related assaults by the deceased against appellant. Appellant testified that on the night of the shooting the deceased's eyes looked like "bottles of fire" and that he seemed "crazed on marihuana." Given this substantial body of testimony concerning the deceased's use of marihuana and its violent effect on him, the trial court's refusal to admit Garrett's proffered testimony was not reversible error. *Brown v. State*, 508 S.W.2d 91 (Tex.Cr.App.1974); *Coleman v. State*, 442 S.W.2d 338 (Tex.Cr.App.1969).

■ In several grounds of error, appellant contends that the prosecutor engaged in improper jury argument during the guilt-innocence stage of the trial. In the first of these grounds of error, appellant contends that the prosecutor misstated the law of self–defense when he argued:

"Of course, in this murder case, as in a great number of murder cases, the law is that a person has the right of self defense. In this murder case, as in other murder cases, that self defense issue is raised because if a defense is not raised they are guilty as charged. So the accused had to raise some sort of defense in this case, otherwise all the jury had to do is walk out and say yes, she's guilty.

"MR. DUSHMAN: Excuse me, Your Honor. I'm going to object to counsel arguing that, that is a misstatement of the law. It's not the duty of the Defendant to raise an affirmative issue in this case or any case. It's the burden of the State to go forward with the proof as the law prescribes, proof beyond a reasonable doubt as to whether or not a person is guilty.

"THE COURT: The Court has charged the jury on the law with reference to that facet."

Appellant failed to secure a ruling on her objection, nor did she request an instruction to disregard. Therefore, nothing is presented for review. *Cain v. State*, 549 S.W.2d 707 (Tex.Cr.App.1977); *Johnson v. State*, 527 S.W.2d 525 (Tex.Cr.App.1975); *Nichols v. State*, 504 S.W.2d 462 (Tex.Cr.App.1974). The trial court correctly charged the jury on the law of self–defense. The prosecutor's remark, while erroneous, was not so prejudicial or manifestly improper as to require a reversal of the judgment.

■ Appellant complains that the prosecutor's reference to her place of employment as a "beer joint" was designed to prejudice the jury against her. She draws attention to the two following remarks:

"You remember that they were referring to it as a cafe when all it boiled down to as selling pig knuckles and beer. Let's face it. Where she worked was in this beer joint."

"By the way, I don't know why they referred to it all the time as the cafe. We did not introduce the word cafe. It was only through eliciting testimony that the witness said that these cafes they kept talking about were in truth beer joints."

The evidence shows that appellant worked at Johnson's Cafe, which was owned and operated by her parents. During her cross–examination, she was asked:

"Q. Do they serve food down there?

"A. Only pig's feet.

"Q. Only pig's feet?

"A. Yes, sir.

"Q. Actually, it's not a restaurant, it's a beer joint, isn't it?

"A. Yes, sir."

Thus, these and the other references to a beer joint in the prosecutor's argument were supported by the evidence. Moreover, appellant never objected to the prosecutor's

use of the term. Nothing is presented for review. *Cain v. State*, supra; *Webb v. State*, 503 S.W.2d 799 (Tex.Cr.App.1974); *Joines v. State*, 482 S.W.2d 205 (Tex.Cr. App.1972).

■ Appellant contends that the prosecutor injected his personal opinion as to the credibility of the defense witness Shelly Morgan when he argued (the emphasized passage being that to which this ground of error relates):

"I will point out this, that the embarrassment that may have been caused to her alluded to by Counsel for the Defense as to her marriages and children and so forth–it wasn't done to embarrass her. It was done to show you what kind of person she was and to demonstrate to you her credibility as a witness. That is the only tool that we as lawyers have. We can't judge these people that get on this witness stand nor can you unless we can elicit from them information about them that will tell us are they truthful, credible people worthy of belief or are they in fact people whose conduct, background and habits, *patterns of life, is such that I cannot place credence in their story. I cannot believe them.*"

Appellant did not object to this remark. Moreover, the record reflects that the prosecutor's argument was invited by defense counsel's argument, in which he accused the prosecutor of trying to embarrass Morgan and prejudice the jury against her by cross-examining her about her children, one of whom was born out of wedlock. *Alejandro v. State*, 493 S.W.2d 230 (Tex.Cr.App.1973).

■ Appellant contends that the prosecutor injected unsworn testimony bolstering a State's witness when he argued:

"Now the officers testified here that they found blood to the left and inside towards the bathroom on the floor. I have no reason to believe that the crime scene search officer would have any reason to misrepresent any fact to you from that stand. I have never seen the man before and I do not know him. He told me that and I believe him."

Appellant did not object to this statement. In addition the argument was invited by defense counsel's argument, a portion of which was as follows:

"The expert, this expert, the physical fact gatherer, who happens to be an expert on whether blood is fresh or whether it's not fresh. For all I know the blood he saw was old blood of hers and not the other stuff of more recent from him because I know he bled somewhere, I don't doubt it.

&ast; &ast; &ast; &ast; &ast; &ast;

"Yet Spinks [the crime scene search officer] could barely remember and after a conversation with the district attorney as early as this morning hesitated just a bit and said what did I have? You know, those sort of things.

"Folks, is that being forthright? . . But is he an expert on the things that he had been doing? And when you get down to it, the accurate physical findings. He didn't measure the rooms. He didn't measure where the blood spots were exactly. There were so many things that we went through that he didn't do."

See *Lapp v. State*, 519 S.W.2d 443 (Tex.Cr. App.1975).

■ Appellant contends that the prosecutor injected unsworn testimony as to what he would do if he were in appellant's place when he stated:

"If I were in her case, if I were in her situation and I was testifying I would certainly testify in my own behalf, too, and I would not testify to anything that was favorable to the State. Remember who has everything to gain and nothing to lose from their testimony. This Defendant, that is who."

Appellant did not object to this statement. In any event, the remark was a reasonable comment on the credibility of appellant's testimony and was not improper. *Doby v. State*, 363 S.W.2d 286 (Tex.Cr. App.1963); *Redding v. State*, 166 Tex.Cr.R. 517, 316 S.W.2d 724 (1958).

■ Appellant contends that the prosecutor improperly injected his personal opinion about the feelings of Howard Chopp. The prosecutor argued:

"He is a witness that you are going to have to judge as to his credibility. I believe that he was fond of his brother. He came to visit him. His brother helped him financially in school. He has finished his college education now and I imagine he feels indebted to his brother. I know he feels a loss."

Appellant did not object to this remark, which was invited by the following argument by defense counsel:

"After they got a statement from Howard at that time his testimony changed from what he told Officer Gatlin because he was under arrest. He knew then that his brother was dead and he was sitting in that cold jail up there. He started trying to do two things. One is give a little revenge from the death of his brother, but once you have given a statement you have kind of got to live with it whether he wants to or not.

"The second thing is being under arrest. There is not only the feeling about her now, but his own self is at stake. He certainly wants to make it very clear.

"Okay. If there was a struggle why didn't he do what others did and that was jump up immediately and stop it? Now you know if the tables had been turned and during any supposed struggle—that the police officer couldn't find a sign of—and if he had actually at that time choked her and killed her, like he had choked her on other occasions, I will guarantee you one hundred percent beyond all reasonable doubt that Howard would be up here on the stand in behalf of his brother. Yes, he would.

"Why didn't he stop the struggle if there was one? What kind of a man was that?

"Well, my brother is just beating up the old gal. She provoked it."

■ Appellant complains of two instances of allegedly improper jury argument by the prosecutor during the punishment stage of the trial. He first contends that the prosecutor improperly injected his personal opinion about the future actions of appellant. The prosecutor argued, relative to the statutory conditions of probation:

"Support her dependents. She never has. I doubt that she will. Her father and mother have provided their home since their birth. You will remember the testimony and you can conclude that from it. They will continue to provide for those children."

Appellant did not object to this statement. Moreover, the prosecutor was responding to the argument by defense counsel that appellant would support her dependent children if granted probation and drawing a reasonable inference from the evidence, which showed that her children had lived in her father's home most of their lives.

■ Appellant contends that the prosecutor misstated the law of probation when he argued that "the State of Texas . . does not regard [murder] as a probatable offense." While this is certainly a misstatement of the law, see V.A.C.C.P. Art. 42.12, appellant did not object to the remark. Also, the remark was made within the context of a legitimate plea for law enforcement. The prosecutor argued as follows:

"Murder is murder any way you look at it. Murder is something that the State of Texas and Tarrant County, that I represent, does not regard as a probatable offense. The State would ask you not to consider probation.

"Remember, if you will, please, when you were out here in the courtroom and I was selecting the jury I said would you each promise that you would consider the full range of punishment under the law as the Court shall direct you. The full range of punishment is five years to life or ninety-nine years in the penitentiary.

\* \* \* \* \* \*

"Remember something else, too, that I also said. That the Defendant had filed an application for probated sentence and I said now you are obliged to answering the questions of the Defense to consider probation, but you do not have to grant probation. You may consider it and reject it. In murder of this kind—this kind

—let's just call it murder; that's what it is. It's the worst crime you can commit when you take the life of a fellow man or a fellow woman.

"Murder is murder and murder should be punished. People must not feel in our community that murder can be committed and that somebody can be found guilty for it and no punishment assessed that is not commensurable with the standard of our community."

The trial court properly submitted appellant's request for probation to the jury. The prosecutor's remark, while erroneous, was not so manifestly improper as to require a reversal of the judgment.

Conceding that none of her grounds of error concerning the prosecutor's jury arguments were properly preserved, appellant argues that "when the entire tone of the final arguments is considered, the individual grounds cited above come together and constitute fundamental error in that the arguments are so fraught with impermissible and manifestly improper and harmful statements as to indicate a willful and calculated effort on the part of the prosecution to deny this Appellant a fair and impartial hearing." We disagree.

 This Court will not hesitate to reverse a judgment when the prosecutor engages in conduct calculated to deny the accused a fair and impartial trial. See *Cook v. State*, 540 S.W.2d 708 (Tex.Cr.App. 1978); *Boyde v. State*, 513 S.W.2d 588 (Tex. Cr.App.1974); *Renn v. State*, 495 S.W.2d 922 (Tex.Cr.App.1973); *Stein v. State*, 492 S.W.2d 548 (Tex.Cr.App.1973). However, of the several instances of allegedly improper jury argument cited by appellant and discussed above, only two, the misstatements of law concerning self-defense and probation, were in fact erroneous. A reading of the transcription of the court reporter's notes does not disclose a willful and calculated effort on the part of the prosecution to deny appellant a fair and impartial trial.

The judgment is affirmed.

CLINTON, Judge, dissenting.

I cannot take part in the majority disposition of this appellant's grounds of error five through twelve in which it is concluded that "a reading of the transcription of the court reporter's notes does not disclose a willful and calculated effort on the part of the prosecution to deny appellant a fair and impartial trial." The majority bases its disposition upon a selective reading of crucial facts and the astonishing legal conclusion that "only two of [the alleged improper arguments], the misstatements of law concerning self-defense and probation, were in fact erroneous." And all this, without resort to authority.[1]

I believe that this case illustrates with poignance the wisdom of considering allegations of prosecutorial misconduct in context and in light of the record as a whole. As such, rather than attempt to respond to each factual misstatement and every erroneous legal analysis contained in the majority opinion, I shall endeavor to recount the context in which the prosecutor's conduct arose and treat the issues regarding that conduct in that light.

---

1. Indeed, the majority pragmatizes its conclusions that the prosecutor's misstatements of the law concerning the two most substantial issues in the case self defense and probation did not constitute error, by warranting that the trial court properly charged the jury on these issues.

It is this writer's understanding of the authorities that this is the very thing–assault upon the court's instructions to the jury by the prosecutor- which is condemned. See, e. g., *Kincaid v. State*, 534 S.W.2d 340 (Tex.Cr.App. 1976); *Jones v. State*, 522 S.W.2d 225 (Tex.Cr. App.1975); *Davis v. State*, 506 S.W.2d 909 (Tex.Cr.App.1974); *Brady v. State*, 122 Tex. Cr.R. 279, 55 S.W.2d 104 (1932); *Williams v. State*, 35 S.W.2d 726 (Tex.Cr.App.1931); *Funderburk v. State*, 117 Tex.Cr.R. 182, 35 S.W.2d 417 (1931); *Davis v. State*, 114 Tex.Cr.R. 620, 26 S.W.2d 649 (1930); *Rodriguez v. State*, 100 Tex.Cr.R. 11, 271 S.W. 380 (1925), [wherein convictions reversed for prosecutorial arguments misstating law in a manner contrary to court's charge]; compare *James v. State*, 563 S.W.2d 599 (Tex.Cr.App.1978); *Givens v. State*, 554 S.W.2d 199 (Tex.Cr.App.1977); *Hill v. State*, 518 S.W.2d 810 (Tex.Cr.App.1975); *Lincoln v. State*, 508 S.W.2d 635 (Tex.Cr.App. 1974); *Singleton v. State*, 479 S.W.2d 672 (Tex. Cr.App.1972) [wherein no error shown because misstatements were not of law contained in court's charge].

When viewed in a light most favorable to the verdict, the evidence reflects that at approximately 3:00 a. m., appellant arrived at the duplex that she shared with Sammie Lee Chopp on the morning of March 28, 1976. However Chopp, brother of Sammie Lee, was visiting the couple and was asleep on the living room sofa. Howard testified that he was awakened by arguing; he heard his brother ask appellant where she had been until 5:00 a. m. and saw Sammie Lee follow appellant into the bathroom. Appellant walked out of the bathroom and told Sammie Lee it was not 5:00 a. m. Howard Chopp related:

> She told him the exact time and he came out and the next thing I know they were rolling in the floor and I heard two gunshots followed by a single gunshot and then she got up and he was still lying on the floor. She said you won't do it anymore, son of a bitch, and continued to fire the gun until it was empty. * * * I . . . grabbed the pistol out of her hand. I said 'Billie, look what you went and done.' She said she didn't mean to . . . and I asked her was she in her car because [Sammie Lee] was groaning and moaning.

Howard Chopp testified that the argument between appellant and the deceased had lasted about ten minutes; he stated that he "dozed back off. . . . [T]hey argued a lot.[2] I didn't pay that much attention to their arguing." According to Chopp, *he did not see how appellant and the deceased "got on the floor."* [3]

After the shooting, appellant "started jumping around saying he was dead, he was dead, and he started breathing, you know, groaning, . . . and grunting like, you know, trying to say something." On the way to the hospital appellant kept telling him to hurry, and after they arrived she was crying.

Dr. Felix Gwozdz, Chief Medical Examiner for Tarrant County, testified that the cause of Sammie Lee Chopp's death was bleeding into the chest as a result of multiple gunshot wounds. According to Dr. Gwozdz, the six entrance wounds entered the front of the body at an angle "from the direction of the leg toward the direction of the head." The order of the shots could not be determined.

Fort Worth police officer Dickie Gatlin testified that he arrived at Harris Hospital in the morning hours of March 28, 1976 and talked with appellant. She told Gatlin she had shot the deceased when he knocked her

---

**2.** Another argument between the victim and appellant which occurred at "Pearly's Paradise" was recounted by Chopp in his testimony. One evening as Howard, Sammie Lee and a "young lady" were sitting in a nightclub, appellant came over to Sammie Lee and told him to come outside with her. When the deceased resisted, appellant "started pulling him . . . and he jumped up and hit her across the eye." Appellant pulled a pistol and each was restrained by onlookers. According to Howard Chopp, appellant was cut under the eye and still has a scar. Chopp characterized this incident as having been "provoked" by appellant, though he testified that appellant was not yelling or causing a "commotion," but "was more like pulling on him and insisting that he come." (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

**3.** Fort Worth police officer Dickie Wayne Gatlin testified that on the night of the incident, he questioned Howard Chopp about the killing and thereafter wrote in his police report:

> Mr. Chopp stated he was asleep and was *awakened by [sic] gunshot.* He stated that he got up and found his brother, Sammie Chopp, shot and his sister-in-law, Billie Johnson, standing with a gun in her hand.

When Chopp was confronted on cross-examination with the possibility of having made such a statement, he denied it at first, but then said, "That may have been the second time. See–I dozed back off * * * I never did wake up wholly. As I stated to you, I didn't wake up wholly at first. It was their business, what they were arguing about."

Irrespective of whether Chopp was awakened by an argument, a gunshot or not at all, because he testified to each version it is a distortion to assert that he "witnessed the shooting," as does the majority opinion. Because they reflect the tenuity of the State's evidence of guilt, the internal conflicts, lapses and equivocation within the testimony of this main prosecution witness, are of more than passing interest in this case, as will be discussed herein.

down and she came up firing.[4] Appellant appeared to have been drinking, but in Gatlin's opinion, was not intoxicated, and was cooperative. Both appellant and Howard Chopp were placed under arrest, and Gatlin, accompanied by another officer went to the scene of the shooting and entered the duplex through a window [5] in order to conduct a search. There, the officers discovered blood stains [6] on the living room carpet and six spent cartridges; the six shot revolver was recovered from a closet where it had been placed by Howard Chopp.

Jimmy L. Spinks of the Fort Worth Police Crime Scene Search Division met Officer Gatlin at the hospital on the night of the shooting and accompanied him to the scene without speaking with appellant. According to both Spinks and Gatlin, appellant's duplex was in good order and there was no sign of a struggle. Spinks testified that there was no way to tell by looking at the living room, exactly how the deceased's body fell notwithstanding the blood stains on the carpet which Spinks identified as fresh. See n. 6, ante.

By grounds of error five through twelve, appellant asserts that upon consideration of the entire tone of the prosecutor's final arguments, the record supports a finding that the "arguments are so fraught with impermissible and manifestly improper and harmful statements as to indicate a willful and calculated effort on the part of the prosecution to deny appellant a fair and impartial hearing" and thereby constitute fundamental error, notwithstanding the failure to consistently preserve objections to individual statements for appeal.[7] The State's sole response to each of these grounds of error is that appellant waived her complaints by failure to obtain rulings or instructions to disregard from the trial court. The State's fundamental assertion is that instructions to disregard the various arguments complained of would have cured any error attending the improper arguments by the prosecutor. I agree with appellant that the prosecutor's statements made before the jury, taken as a whole, were misleading and highly prejudicial. See *Brandon v. State*, 599 S.W.2d 567 (Tex. Cr.App., 1979).

It is initially observed that reversal of a conviction will occur only in extreme cases, where the improper argument is manifestly harmful or prejudicial, as well as material and calculated to injuriously affect the rights of the accused. *Kerns v. State*, 550 S.W.2d 91 (Tex.Cr.App.1977); *Fowler v. State*, 500 S.W.2d 643 (Tex.Cr.App.1973) (Douglas, J., dissenting); *Thompson v. State*, 480 S.W.2d 624 (Tex.Cr.App.1972); *Gatlin v. State*, 113 Tex.Cr.R. 247, 20 S.W.2d 431 (1929); *Vineyard v. State*, 96 Tex.Cr.R. 401, 257 S.W. 548 (1924); *Bowlin v. State*, 93 Tex.Cr.R. 452, 248 S.W. 396 (1922).

Analysis of the issue requires consideration of not only the record as a whole, including the facts adduced, the issues involved, the nature of the offense and the verdict,[8] but also the probability that the conviction was the result of passion or prejudice engendered by the argument,[9] or the result of the jury's consideration of matters

---

4. Contrary to the statement by the majority opinion, appellant's testimony was not contradictory to that of Howard Chopp. See *post* at 6 11 for recitation of appellant's testimony.

5. The trial court ruled that this entry into the duplex constituted an illegal search and seizure, but error, if any, incident to admission of the fruits was waived by appellant in her direct testimony.

6. No samples of this blood were taken; therefore, no analysis of it was conducted.

7. Counsel on appeal did not represent appellant at trial and does not raise for our consideration the effectiveness of counsel below.

8. *Fowler v. State* (Dissent), supra; *Gatlin v. State*, supra; see also *Donnelly v. De Christoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); and *Houston v. Estelle*, 569 F.2d 372 (5th Cir. 1978).

9. *Blansett v. State*, 556 S.W.2d 322 (Tex.Cr. App.1977); *Mayberry v. State*, 532 S.W.2d 80 (Tex.Cr.App.1976) (on State's Motion for Rehearing); *Hodge v. State*, 488 S.W.2d 779 (Tex.Cr.App.1973).

other than evidence duly processed in accordance with law.[10]

When confronted with a record in which few objections have been perfected, this Court should hesitate long to reverse a conviction absent a clear revelation by the record that the prosecutorial misconduct constituting the alleged error—viewed in light of all the above criteria—has vitiated the fundamental fairness of the proceeding and thereby risen to error of constitutional dimension as a deprivation of due process of law. *Ruth v. State,* 522 S.W.2d 517 (Tex. Cr.App.1973); *Anderson v. State,* 525 S.W.2d 20 (Tex.Cr.App.1975); *Boyde v. State,* 513 S.W.2d 588 (Tex.Cr.App.1974); *Bray v. State,* 478 S.W.2d 89 (Tex.Cr.App. 1972); *Houston v. Estelle,* 569 F.2d 372 (5th Cir. 1978); *Skuy v. U. S.,* 261 F. 316 (10th Cir. 1919). See also *Brandon v. State,* supra; *Klueppel v. State,* 505 S.W.2d 572 (Tex.Cr.App.1974); and *Baldwin v. State,* 499 S.W.2d 7 (Tex.Cr.App.1974). A review of the uncontradicted defensive evidence is therefore necessary.

Appellant's case in chief focused on establishing self defense. Taking the stand in her own behalf, appellant testified that she generally worked seven days a week in Johnson's cafe, owned by her parents and located in a poor part of Fort Worth. Because she frequently closed the cafe and carried the day's cash receipts with her in the early morning hours, she carried a pistol.[11] According to appellant, the deceased had lived with her for about a year; in that time he had never worked and was supported by appellant and her parents. Appellant testified that the deceased smoked marihuana frequently and when he did so, he seemed angry, as if he were "mad at the world." Appellant could tell when Sammie Lee had been smoking marihuana, not only by his behavior, but also because his eyes became red. According to appellant, the deceased had beat her after smoking marihuana so many times she could no longer differentiate between all of the incidents.[12]

On Saturday, March 27, 1976, the deceased called appellant's uncle, George Garrett, and asked him to take appellant to wash clothes. Garrett picked appellant up, and by about 12:00 noon the two had arrived at Johnson's Cafe. Appellant worked most of the day; the deceased came into the cafe around 7:00 p. m. Later, appellant's mother advised her that she could go out for the evening because it was a slow night. Appellant testified that she asked the deceased to accompany her and Garrett, but "he shook his head saying no, he didn't want to go." According to both appellant

10. *Turrentine v. State,* 536 S.W.2d 219 (Tex.Cr. App.1976); *Renn v. State,* 495 S.W.2d 922 (Tex.Cr.App.1973); *Cazares v. State,* 488 S.W.2d 110 (Tex.Cr.App.1972); *Pennington v. State,* 171 Tex.Cr.R. 130, 345 S.W.2d 527 (1961); *Porter v. State,* 154 Tex.Cr.R. 252, 226 S.W.2d 435 (1950); *Palmer v. State,* 148 Tex. Cr.R. 39, 184 S.W.2d 471 (1945).

11. At the guilt innocence stage of the trial, the court instructed the jury that,

. . . in connection with the law of self defense . . . Billie Ruth Johnson has a legal right to carry arms upon her premises, and in this case, the defendant had a right to be armed, and the fact that defendant had arms on the occasion in question would in no wise impair her right of self defense.

12. Appellant testified that the first time a violent incident occurred, Sammie Lee had threatened to burn the house down. After appellant moved in with her parents, the deceased came over and "jumped on" appellant, hitting her and telling her she could not leave him. Appellant's father "got him off" her. Appellant eventually moved back home and two weeks thereafter the deceased beat her up again, hitting her in the stomach and ear. She could not get away from the deceased; her two children tried to hide, and Sammie Lee finally left.

Appellant related a third specific violent encounter with the deceased. On the Wednesday before the shooting, appellant stated she found some marihuana on the coffee table and put it up because if she threw it away, Sammie Lee would beat her. The deceased came to the cafe later that day and appellant told him not to smoke marihuana around the children or leave it within their reaches. The deceased hit, kicked and choked appellant until she was out of breath and "some people got him off" her. Appellant testified that she felt the deceased could kill her with his bare hands, and during the altercation at the cafe she "felt like [she] was going to die."

She exhibited scars on her right and left hands and stated they were from incidences in which the deceased had cut and burned her respectively.

and Garrett, the two stopped at the Lakeside Inn Club for awhile and then left, picked up Garrett's girlfriend, and proceeded to a dance at "Gentry's on the west side." Garrett had been drinking most of the day and went to the car where he fell asleep. According to appellant they did not stay at Gentry's long and she had one beer there. Leaving Garrett's girlfriend at Gentry's appellant drove Garrett's car "down Rosedale"[13] and eventually toward Johnson's Cafe. On her way, appellant was stopped by a police officer because the lights on the car were not on all the way. Appellant apparently explained that she was not familiar with Garrett's car, and the officer instructed her to drive the inebriated Garrett home notwithstanding the fact that she had no driver's license.[14]

Appellant proceeded to Johnson's Cafe where she assisted her mother in closing for the night. She left the cafe around 2:30 a.m. and went straight home, with Garrett still sleeping in the back seat of his car.

On arrival at her duplex, appellant took her pistol out from under a pillow in the car and walked into the house where she saw Howard Chopp asleep on the sofa. She then went into her bedroom and turned on the light. The deceased was lying on the bed and told her to "cut the damn lights off" which she did, and went into the bathroom to use it and to put away the pistol.[15] Before appellant could hide the pistol, the deceased came into the bathroom arguing, asking where she had been. Appellant testified that she had washed her hands and gone out of the bathroom toward the living room, when the deceased knocked her to the floor and said, "Bitch, I'm going to kill you." She described Sammie Lee as looking "crazy, his eyes looked like something I had never seen before . . . he was bending over trying to catch me. I was scooting back" until "my head hit the end of the divan and I couldn't go no further." She stated:

> He was still coming at me. I shot him and shot him and he was still coming at me and I shot him and shot him and shot him until I ran out of bullets and his brother grabbed the gun away.[16]

Appellant testified that she could not tell whether the bullets she was firing were hitting the deceased as he continued toward her, and that in all the times he had beaten her, she had never seen such a look in his eyes which she described as "bottles of fire."[17] After Howard Chopp took the gun from appellant, they immediately drove the deceased to the hospital in George Garrett's car, as Garrett lay, still sleeping, in the back seat.

The defense also called appellant's father, Freddie Lee Johnson, who testified that in both the second and third weeks of February, 1976, he witnessed the deceased in Johnson's Cafe "jump on" appellant and "whip[ ] her with a pool stick;" the second time, Johnson stated that Sammie Lee was "knocking blood from her." Johnson related that in the first week of March, the deceased got appellant down on the ground outside the witness' house "and was beating her with his fists." Johnson pulled the deceased off appellant each of these times

13. The testimony in unclear as to what "Rosedale" is, but we assume it is such a well known thoroughfare in Fort Worth that making a more precise identity did not occur to anyone.

14. Appellant was issued a traffic citation for "no driver's license," which reflected the time as 1:20 a. m., March 28, 1976. This citation was admitted into evidence as Defendant's Exhibit No. 3.

15. Appellant testified that she did not want to put the pistol up in the deceased's presence because she was afraid that "he would do something with it," like "try to kill me with it."

16. The court instructed the jury,

. . . that if the defendant fired any shot at the deceased in defense of herself, then she had the right to continue shooting until the danger or apparent danger ceased, or as long as it reasonably appeared to her, as viewed from her standpoint alone at the time, that she was in danger.

17. On cross–examination, the prosecutor asked appellant whether on another occasion, she had told the police that she had "started shooting . . . and just didn't remember what happened." Appellant readily admitted this, but insisted "I didn't remember it then, but I remember it now."

and attempted to counsel with the two about their problems, but to no avail.

Shelly Jean Morgan testified that in December 1976, her "old man," Frank Garrett,[18] had been out of work, so they moved in with appellant and Sammie Lee Chopp and stayed until one week before the shooting. Morgan testified that Sammie Lee smoked marihuana and drank liquor constantly, that he "was always beating on Billie, choking her and threatening her life." When the deceased was not "stoned" he acted normally toward appellant, but "when he was smoking or drinking his reaction would be different like he is a wild man or something. He just wanted to beat on her." The witness stated that in her opinion, appellant's life had been in danger on several occasions she had observed. Morgan recounted one incident:

I was at home babysitting [one Friday] night and they came in fussing about something. I guess about somebody she talked to and he went to beating on her and got her down on the floor and kicked her. Then he had a hammer—he got a hammer and burned it on the fire * * putting it on top of the stove * * * he was nearly down to hit her with it * * * Frank, my old man, he took the hammer away from him. . . . * * [Sammie Lee] got [a] knife and told Billie he was going to kill her. * * * Then Billie ran into the bathroom after Frank got [Sammie Lee] off her. She was cry-

ing and I went into the bathroom where she was. Frank calmed [Sammie Lee] down.

Morgan stated that she had never seen the appellant do anything to provoke the deceased.[19]

In his opening remarks at the guilt–innocence stage, after thanking the jurors for their attention and reminding them of their function as the triers of fact, the prosecutor began:

Now, I'm going to discuss with you briefly, . . . some phases of the law in this case. . . . In this murder case, as in other murder cases, that self defense is raised because *if a defense is not raised they are guilty as charged. So the accused had to raise some sort of defense*[20] *in this case, otherwise all the jury had to do is walk out and say yes, she's guilty.*[21]

Though this statement was perhaps at worst ambiguous, the prosecutor clarified his intended meaning after appellant's counsel attempted in his argument to explain the correct legal relationship of self defense to the State's burden of proof; in his final closing argument the prosecutor replied:

Remember I asked you upon jury selection . . . and counsel for the defense brought it up, too, that the State has the burden of proof and it has the burden of proof beyond a reasonable doubt. *Not all reasonable doubt as he*

---

**18.** Frank Garrett was ultimately identified as brother of George, appellant's uncle. It was also brought out that George Garrett had introduced appellant to Sammie Lee Chopp, and that appellant considered the Garretts to be close relatives.

**19.** Another incident Shelly Jean Morgan witnessed occurred one night when the women were at home listening to records. The deceased and Frank Garrett came home about 2:00 or 3:00 a.m. The deceased pulled the plug on the record player "and he went outdoors and turned the lights off and took the fuse out of the box to keep us from looking or listening to records." The deceased then jumped on appellant and started beating and choking her. Frank Garrett stopped the fight. Morgan related, "Billie told him she was going to leave because she was tired of him beating on her

and he told me if she left him he was going to kill her."

**20.** Self defense was raised by the testimony of Howard Chopp in the State's case in chief. While this statement, taken out of context, might not constitute a patent misstatement of the law, it was clearly not a reasonable deduction from the evidence.

**21.** Defense counsel objected on the grounds that this was a misstatement of the law, that there is no duty on the defense to raise an issue and that "it's the burden of the State to go forward with the proof as the law prescribes, proof beyond a reasonable doubt as to whether or not a person is guilty." The court replied that the jury had been charged on the law with reference to that facet.

*just got through saying.* But I asked you at that time will you and *can you affirmatively assure me you will not compel the State beyond the reasonable doubt that the law imposes on us?* All of you by your silence said you will not.

The prosecutor was quick to point out that the jury should read the court's instructions so they might see that the prosecution had indeed proved all the allegations in the indictment.[22] However, in his final closing argument he continued:

That is the burden that you said you would hold me to *but only that burden.*

Now all this *self defense* business that has been brought up here *is an affirmative defense.* It has no burden on the State. *We do not have to refute it.* We merely try to if it's possible, but we can't refute falsehoods if given. We can't refute statements that are made if there are no other witnesses to it. *It's an affirmative defense and the burden is entirely upon the defense, not upon State. Don't hold the State* and don't hold the district attorney *with any burden of proof* as regard these other charades you have seen.[23]

These serious misstatements of the law contrary to and nullifying of the court's charge, made at a time when defense counsel was helpless to respond, leave little doubt as to the prosecutor's willingness to step outside the bounds of fundamental fairness in order to obtain a conviction. See *Davis v. State*, 506 S.W.2d 909 (Tex.Cr. App.1974). See also Article 2.01, V.A.C.C.P. Even if an instruction to disregard had been given, I do not believe that the prejudice regarding something so material could have been cured, in light of the evidence and issues involved. *Cook v. State*, 537 S.W.2d 258 (Tex.Cr.App.1976); *Lewis v. State*, 529 S.W.2d 533 (Tex.Cr.App.1975); *Anderson v. State*, 525 S.W.2d 20 (Tex.Cr. App.1975); *Edminston v. State*, 520 S.W.2d 386 (Tex.Cr.App.1975); *Boyde v. State*, 513 S.W.2d 588 (Tex.Cr.App.1974); *Cox v. State*, 157 Tex.Cr.R. 134, 247 S.W.2d 262 (1952).

The record of argument is replete with statements by the assistant district attorney which, as effectively as if he, himself, had testified to such facts from the witness stand, were offered for whatever consideration the jurors might choose to give them.[24] The injection of these new facts harmful to

---

**22.** The indictment alleged the offense in the language of V.T.C.A. Penal Code, § 19.02, entitled "Murder," which provides:

(a) A person commits an offense if he:

(1) intentionally or knowingly causes the death of an individual.

**23.** Compare statutory burden of proof on justification defenses such as self defense, provided by V.T.C.A. Penal Code, § 2.03(d), [set out in n. 31, *post*], with burden of proof on *affirmative* defenses, § 2.04(d), supra, which provides:

"If the issue of the existence of an *affirmative* defense is submitted to the jury, the court shall charge that the *defendant must prove the affirmative defense by a preponderance of the evidence.*"

Thus, if self defense *were* an affirmative defense, the prosecutor's assertion of the proof burdens would have been correct. Since, however, self defense is *not* an affirmative defense this assertion struck at one of the most fundamental precepts known to the conduct of criminal trials.

**24.** Appellant's contention that the deceased smoked marihuana was refuted by the prosecutor:

"[The crime scene search man, Officer Spinks] also said that he viewed and he was

there with the body at Harris Hospital. That there was no odor of marihuana. He said if there had been it would have remained with that corpse that was lying there as a result of this women here shooting him."

Officer Spinks had in fact testified that he smelled no marihuana odor in the *duplex* appellant had shared with the deceased. There was absolutely nothing in the record to support this statement by the prosecutor.

An attack on appellant's law abiding character which apparently could not be accomplished by the introduction of any prior convictions was supplied by the prosecutor:

"Now she comes into the house with that gun and the Court tells you she has a right to have the gun on her premises. That is true. * * * She didn't have a right to have it on at Pearl's Paradise that night. *She carried that gun all the time.*"

"Now I presume that [after closing the cafe appellant had a pistol with her] when she was at Pearl's Paradise and *had the gun out* and *was threatening to kill this deceased . . .* on another occasion. Carrying that pistol on to another beer joint, into another beer joint, on the premises and *threatening to kill him.*

appellant into the testimony "served no purpose other than to inflame and prejudice the minds of the jurors." *Boyde v. State,* 513 S.W.2d 588, 593 (Tex.Cr.App.1974). "Even if instruction to disregard had been requested and granted, the prejudicial effect of the prosecutor's argument would not

have been removed." *Boyde v. State,* supra, at 591. See also *Cook v. State,* supra; and *Edmiston v. State,* supra.

Neither time nor space permits the delineation here of every deduction made by the prosecutor without regard to fact or reason.[25] However, it is appropriate to add

> Now ladies and gentlemen, keeping that in mind, that *she had threatened him with a pistol before,* and that she had testified herself that *she was jealous of this man* -keeping that in mind let's follow the chain of events in this matter that you are to decide very shortly."

Defense counsel answered this argument,

> "Now we recall the testimony of brother [Howard Chopp] . . . Brother would have said that it was provoked. That is okay. You can beat up a woman whenever you feel like it if she is tugging on your arm and trying to get you out away from the girlfriend. That is okay."

The prosecutor replied:

> "Young Howard here didn't testify that the attack on this woman was provoked by her pulling [on the deceased]. *He testified that the fact was that she pulled a gun on him.*"

An objection was made and counsel was instructed to stay inside the record.

The prosecutor also supplied for the jury the scenario of the shooting which Howard Chopp had apparently missed when he "dozed off":

> "If you will remember Dr. Gwozdz's testimony he stated that [the *deceased*] *had received the second wound* . . . through the cheek and *into the frontal lobe* of the brain. *That dropped Sammie Lee Chopp right where he stood. That is why she was able to stand over him and pour the rest of the shots into his supine body lying on the floor.*"

When defense counsel objected that this constituted not only a misstatement of the doctor's opinion, but was also outside the record, the Court replied, "The jury will remember the testimony. Stay in the record." The prosecutor replied, "I am sure they will, Your Honor. I do hope they do."

Further into the record, the prosecutor's scenario was embellished:

> "[The deceased] had not seen [appellant] since she left that one beer joint and at 2:30 in the morning *she comes in obviously having been drinking with a pistol in her hand and he is upset. I don't blame him. I think I would be upset, too, if my wife came home at 2:30 in the morning with a pistol in her hand.* I don't think I can tell you or I don't think anybody can tell you that Sammie may not have struck her, but *I think what is more logical is that Sammie tried to take that pistol away from her* and take it out of her hand at that hour in the morning and in so doing

> they fell to the floor and that awakened Howard. He heard the struggle."

Defense attorney: "Excuse me, Your Honor. There is no testimony to that."

The Court: "Sustained."

Prosecutor: "Howard heard a struggle. . . ."

Defense attorney: "I will ask the Court to instruct the jury not to consider that."

The Court: "Counsel, you can quote testimony, but don't testify on't testify yourself."

The prosecutor then summarized Howard Chopp's testimony regarding the shooting and continued,

> "Now the officers testified here that they found blood to the left and inside towards the bathroom on the floor. *I have no reason to believe that the crime scene search officer would have any reason to misrepresent any fact to you from that stand. I have never seen the man before and I do not know him.* He told me that and *I believe him.*
>
> *He told you,* just as Howard did, *that it appeared that the body was on the left,* not over here against the couch. *A man does not advance on a woman* with outstretched arms and blazing eyes *with a bullet in the front lobe of his brain.* He is lying on the floor."

Defense attorney: "Your Honor, excuse me. I'm going to once again object to that on the grounds that there is no testimony whatsoever to which bullet entered the body first."

The Court: "Sustained."

Defense attorney: "May it please the Court, he elicited that testimony from Dr. Gwordz himself."

The Court: "The jury will remember the testimony."

Prosecutor: "I am sure they will. Dr. Gwozdz testified it was the second bullet."

Defense attorney: "Your Honor "

The Court: "Sustained."

Prosecutor: "He has made reference to Dr. Gwozdz."

The Court: "Counsel, let me correct that."

Prosecutor: "Certainly."

The Court: "He didn't say second bullet. He said number two bullet."

Prosecutor: "*Correct,* Your Honor."

---

**25.** One of the themes repeated in order to discredit appellant's testimony was the disassociated query as to why appellant lived with deceased if he in fact beat her as she claimed and all non professional witnesses, including Howard Chopp, corroborated. The intended infer-

that in stating his opinion that appellant and her witnesses were "liars" the prosecutor came perilously close in his overt appeals to the jurors' prejudices to making those appeals on the basis of the racial dichotomy which existed between the black defendant and defense witnesses, and the all white jury.[26] The prosecutor confronted the jury twice with a question as to why appellant and her witnesses had referred to Johnson's Cafe as a "cafe" when "all it boiled down to was selling pig knuckles and beer. Let's face it. Where she worked was in this beer joint." Notwithstanding the evident fact that the name of the establishment was "Johnson's Cafe," the prosecutor inferred that "these people" were trying to hide the truth from the jury. According to the prosecutor, Shelly Jean Morgan, "the last one that appeared here on the stand that had the four children that were staying at the house with this defendant . . for approximately four months. . . ., [t]hat they slept on a roll away bed, . . told a falsehood, an untruth, a lie if you please" because she testified that appellant's children lived with appellant at times while appellant's father testified his grandchildren had lived with him most of their lives. The appellant was clearly unworthy of belief, according to the prosecutor, because ". . . she tells you about how bad [the deceased] was to her. However, I

don't know why she left the other two men she was married to . . . whether it was because they beat her up or not. I don't know why she left the man that fathered her children out of wedlock. I don't know why she left him. Whether it was because he beat her or not. . . . Nobody knows but her and she wouldn't tell you. The only thing she would tell you is something favorable to her case." After defense counsel attempted to point out to the jurors that these statements by the prosecutor were an appeal to their prejudices [See n. 26, *ante*] and in fact irrelevant to the issues, the prosecutor responded in closing:

I will point out this, that the embarrassment that may have been caused to [Shelly Jean Morgan] alluded to by counsel for the defense as to her marriages and children and so forth—. . . It was done to show you what kind of person she was and to demonstrate to you her credibility as a witness. * * * *We can't judge these people* . . . *nor can you unless we can elicit from them information about them that will tell us* are they truthful, credible people worthy of belief or *are they in fact people whose conduct, background, and habits, patterns of life, is such that I cannot place credence in their story. I cannot believe them.*[27]

ence was that appellant was lying about the beatings. In hearings conducted on Senate Bill No. 2759 before the *Committee on Human Resources* on *Domestic Violence Prevention and Services Act*, 95th Cong., 2nd Sess. (1978), the committee heard and subsequently reported:

In 85% of cases of spouse murder in one year in Kansas City, Mo., the police were summoned at least once before the murder occurred, and in 50% of the cases, they had been called five or more times before the homicide occurred.

One fifth of all police deaths in the United States and 40% of all police injuries occur in the line of duty in domestic violence intervention.

The F.B.I. estimates that the incidences reported represent less than 10% of the total number of "wife beatings" which occur.

"In order to understand battering it is necessary to explode some myths. The two common misconceptions are: (1) family violence only occurs in 'those' neighborhoods, that is,

low socio-economic, uneducated environments; and, (2) women enjoy being beaten; otherwise they would leave." S.Rep. No. 95–824, 95th Cong., 2nd Sess. 25 (1978).

26. During his final argument, defense counsel felt it necessary to say to the jury, "I don't know, I guess that the *blacks maybe still live a little different from we do* and their values are a little different. . . ." It is reasonable to conclude, not only from this statement, but also from several statements of the prosecutor, that there were no black jurors in this trial. See generally *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152 (2 Cir. 1973).

27. This Court has held that proof of prior marriages and divorces is inadmissible unless relevant to a contested issue in the case. *Boyde v. State*, 513 S.W.2d 588 (Tex.Cr.App.1974); *Hatke v. State*, 455 S.W.2d 310 (Tex.Cr.App. 1970); *Sample v. State*, 158 Tex.Cr.R. 200, 254 S.W.2d 401 (1953). The fact that information

While I hesitate to conclude that this was a patent racial slur from the face of the cold record before us,[28] it is nevertheless a clear appeal to the jury to disbelieve witnesses solely because they are "different." [See and compare *Allison v. State,* 248 S.W.2d 147 (Tex.Cr.App.1952) and cases cited therein.][29] The prosecutor's parting comment on appellant's defense was: "Not one of [appellant's witnesses] was anything but a red herring drug across your path to bring something to your mind besides the facts as he saw them and testified to by Howard Chopp."[30]

The record of the guilt–innocence stage as a whole reveals that, on being confronted with the instant state of facts, issues and evidence, the prosecutor assumed the task in his final argument, of encouraging the jurors to abdicate their responsibility as delineated by the court's charge. The thrust of the prosecutor's argument was to assuage any hesitation on the part of the jurors to reject appellant's claim of self defense. The major premise from which the prosecutor invited the jury to reason with him, focused on shifting the burden of proof under the facts of this case from the State to the defense on the issue of intent, the only issue in the case. From here the prosecutor sought to discredit the evidence favorable to appellant through misstatements of testimony, interjection of his unsworn opinion and appeals to the jury to disregard testimony of defense witnesses because their "life styles" made them unworthy of belief. The logical conclusion of such a syllogism is that because appellant entered the trial guilty of murder and subsequently failed to meet her burden of proving self defense by credible evidence, the case was left in its original stead, and the jurors had no choice but to render the appropriate verdict of guilty. Such serious distortion of legal principles,[31] basic to our

in this vein was brought out before the jury without objection, does not make it relevant.

The majority, however, is satisfied that this argument was "invited" when defense counsel "accused the prosecutor of trying to embarrass Morgan and prejudice the jury against her by cross examining her about her children, one of whom was born out of wedlock." In response to this "accusation," the prosecutor explained that no, he did not want to prejudice the jury against Morgan he simply wanted them to *disbelieve* her because of her "background and habits, patterns of life."

Does the majority fashion a rule today which holds that meretricious relationships and illegitimate children extant in one's "habits" and "patterns of life" is relevant to the issue of credibility? If not, I find the prosecutor's defense of his statements to constitute a distinction without difference.

**28.** In *United States ex rel. Haynes v. McKendrick,* supra, the following argument was characterized by the court as "surely a racial slur" at 160, n. 11:

"Here she is, a young girl about 13. And I know that you have recalled this young McCray girl who is the tall sister of Jones. *That young lady had her first baby at 15. She is now married at 16 with another baby on the way.* The maturity among *these people* becomes quite evident quite quickly."

**29.** See also, e. g., *Hilson v. State,* 96 Tex.Cr.R. 550, 258 S.W. 826 (1924); and *Arnold v. State,* 96 Tex.Cr.R. 214, 256 S.W. 919 (1923); and *United States ex rel. Haynes v. McKendrick,* supra.

**30.** The trial court charged the jury that " . . in determining the existence of real or apparent danger, it is your duty to consider all of the facts and circumstances in the case in evidence before you and consider the words, acts, and conduct, if any, of Sammie Lee Chopp, Jr. at the time of and prior to the time of the alleged assault and consider whatever threats, if any, the said Sammie Lee Chopp, Jr. may have made to the defendant and consider any difficulty or difficulties which the same Sammie Lee Chopp, Jr. had had with the defendant, and in considering such circumstances you should place yourselves in defendant's position at that time and view them from her standpoint alone."

**31.** "The defendant in a criminal case is presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt, and in case of reasonable doubt as to his guilt he is entitled to be acquitted." Art. 38.02, V.A.C.C.P. See also V.T.C.A. Penal Code, Section 2.01 which provides in part:

"All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt."

V.T.C.A. Penal Code, Section 2.03 entitled "Defense" provides in pertinent part:

"(a) A defense to prosecution . . . is so labeled by the phrase: '*It is a defense to prosecution.* . . .'

\* \* \* \* \* \*

(c) The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense.

system of criminal justice, cannot coexist with the application of guarantees of a fair trial.

Finally, I am obliged to address further misconduct on the part of the prosecutor in the delivery of his argument at the punishment phase. The only evidence presented was the testimony of appellant, her mother and an uncle regarding her desire and ability to pay for her crime while on probation. The State waived opening argument and after the defense had no further opportunity to respond, the prosecutor began:

Murder is murder anyway you look at it. *Murder is something that the State of Texas and Tarrant County*, that I represent, *does not regard as a probatable offense.* The State would ask you not to consider probation. * * * *The full range* of punishment *is five to life or ninety–nine years* in the *penitentiary.*

The prosecutor then pointed out to the jurors that they were obligated to consider probation, but continued,

people must not feel in our community that murder can be committed and that somebody can be found guilty for it and no punishment assessed [–] that is not commensurable [sic] with the standard of our community. * * * I submit that you can conclude from the testimony of the life style of this woman here, her habits, her pattern of conduct, the carrying of arms, the once before trying to kill

the man–that she is not the proper subject of probation."

The State's argument was concluded by answering appellant's testimony that she would support her dependents as a condition of probation,

Support her dependents. *She never has. I doubt that she will.* Her father and mother have provided their home since their birth.

There was no testimony as to what "The State of Texas" or "Tarrant County" regards as a probatable offense, nor was there any basis for the Assistant District Attorney's inference that probation is "no punishment assessed." The law recognizes a distinction between an unsworn assertion as to what the community thinks, says, or wants, and an assertion of the opinion of the prosecuting attorney as to what the community is *entitled* to rely on in the law enforcement process. The argument here is in the nature of the former and therefore, impermissible. *Porter v. State*, supra; *Cox v. State*, supra. See also *Pennington v. State*, supra. Furthermore, the prosecutor's expression of his personal opinion as to the credibility of appellant based on her life style, along with his unsworn statement that appellant never supported her dependents, were improper.[32] *Villalobos v. State*, 568 S.W.2d 134 (Tex.Cr.App.1978); *Houston v. Estelle*, supra.

---

(d) If the issue of the existence of a defense is submitted to the jury, the court shall charge that *a reasonable doubt on the issue requires that the defendant be acquitted.* (e) A ground of defense in a penal law that is not plainly labeled in accordance with this chapter has the procedural and evidentiary consequences of a defense."
V.T.C.A. Penal Code, Chapter 9, provides in relevant part:
"Section 9.02. Justification as a Defense
*It is a defense to prosecution that the conduct* in question *is justified* under this chapter."
"Section 9.31. Self–Defense
(a) . . . *[A] person is justified* in using force against whether another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force."

"Section 9.32. Deadly Force in Defense of Person
*A person is justified* in using deadly force against another:
(1) if he would be justified in using force against the other under Section 9.31 of this code;
(2) if a reasonable person in the actor's situation would not have retreated; and
(3) when and to the degree he reasonably believes the deadly force is immediately necessary:
(A) to protect himself against the other's use or attempted use of unlawful deadly force; . . ." [All emphasis is supplied]

**32.** Unlike the majority, I am unable to draw a "reasonable inference" that appellant had *never supported* her dependents, from evidence that the children had resided with their grandparents most of their lives.

I do not substitute my judgment on the issue of credibility of the witnesses for that of the jury; rather, I note—benefited by notions of due process of law—that the prosecutor's chosen method of impeachment of the defense witnesses reflects either his inability to impeach otherwise, or a disregard of fundamental fairness. The pervasive misconduct of the prosecutor can only be construed as an intentional, calculated attempt to adulterate the fact finding process and thereby deny appellant the most fundamental requisites of a fair trial.[33] *Brandon v. State,* supra. The State's evidence was a far cry from "overwhelming." If convictions cannot be obtained without resort by the State to such methods as illustrated here, it is a fair conclusion that the State is not entitled to them. *Hickerson v. State,* 162 Tex.Cr.R. 446, 286 S.W.2d 437 (1956).

I am convinced that the probability of prejudice was sufficiently great and the case sufficiently close that appellant is entitled to a new trial. I cannot say that with a fair presentation of the issues, law and evidence involved in this case, the jury would have nevertheless found appellant guilty and assessed for her a fifteen year prison term. I firmly believe that only a new jury can make that determination. For the reasons stated, I dissent to the panel's approval of the conviction obtained in this trial proceeding.

---

**33.** His misconduct was also violative of his "primary duty . . . not to convict, but to see that justice is done" imposed by Article 2.01, V.A.C.C.P. So that we do not betray our own responsibility, this Court should insist that the duty imposed on them by legislative mandate is scrupulously observed, honored and executed by prosecuting attorneys. Our society, more than an accused, and the criminal justice system are the real beneficiaries when justice is done.